ELIZABETH SEVIOUR'S ADMR. *v.* RUTLAND RAILROAD COMPANY.

February Term, 1914.

Present: POWERS, C. J., MUNSON, WATSON, AND HASELTON, JJ.

Opinion filed October 14, 1914.

*Railroads—Negligence—Crossing Accident—Right of Trial Court to Express Opinion on Weight of Evidence—Positive and Negative Evidence—Last Clear Chance—Sufficiency of Evidence.*

On the issue whether two women, killed by a train while they were driving over a railroad-highway crossing at a grade, could know by the sound whether the approaching train was a freight train or a passenger train, the question, "Are you able to distinguish which kind of train is approaching by the sound?" asked of a witness whose opportunities for observation before the accident had been the same as those of the decedents, was properly excluded, as involving the determination of the understanding that persons of different capabilities and different habits of observation would gain from the same opportunities.

The trial court, in instructing the jury, has a right to express its opinion on the evidence and the weight thereof, provided the expression is fair and reasonable, and is accompanied by instructions that plainly leave the determination to the jury.

In an action against a railroad company for the death of a woman, killed by a train while she was driving over a railroad-highway crossing at grade, where the evidence was contradictory as to whether the required crossing signals were given, and the court instructed the jury that the burden was on the plaintiff to make out by a fair balance of the evidence that the whistle was not sounded or the bell not rung, the further instruction that the jury were to keep in mind that both the statute and the rules of the company required that the engineer perform that duty, and the probability of his having done it, and thereupon submitted the question, "Do you find by a fair balance of the evidence that the signals were not given?" was not error, but was at most, an expression of the court's opinion that the requirement afforded some support to the testimony that the signals were in fact given.

There is a distinction between positive evidence and negative evidence which frequently makes the former entitled to more weight than the latter; and it depends upon the circumstances of the particular case whether the jury should be so instructed, for in some cases so to instruct might be error.

In an action against a railroad company for the death of a woman, killed by a train while she was driving over a railroad-highway crossing at grade, where the evidence was conflicting as to whether the required crossing signals were given, defendant's evidence showing affirmatively that they were given, and plaintiff's evidence that they were not given consisting of testimony of men who worked in. stores and in a mill near the crossing, some of whom testified that they did not hear the whistle, others that they did not remember of hearing any, others that there was none, and others that one long whistle was given, and no other, it was not error to instruct the jury that there is a distinction between positive evidence and negative evidence which should be taken into account; that the former is entitled to greater weight than the latter, and that in weighing such evidence they should consider all of the surrounding circumstances.

In an action against a railroad company for the death of a woman, killed by a train while she was driving over a railroad-highway crossing at grade, evidence examined, and *held* that it did not fairly and reasonably tend to show that the accident was owing to any failure on the part of the defendant's servants to do what they could to avert the accident after it was manifest that the team was attempting to cross the track, and, hence, that no instruction was required on the doctrine of "the last clear chance."

CASE for negligence. Plea, the general issue. Trial by jury at the April Term, 1913, Windham County, *Taylor,* J., presiding. Verdict and judgment for the defendant. The plaintiff excepted. The opinion states the case.

*Hugh Henry, Clarke C. Fitts,* and *Herman Eddy* for the plaintiff.

*Edwin W. Lawrence* and *T. W. Moloney* for the defendant.

MUNSON, J.  Mrs. Seviour, the plaintiff's intestate, and her sister, Miss Hazen, while riding in a light open wagon drawn by

one horse, with Miss Hazen driving, were killed by a north-bound train of the defendant at the first crossing north of Chester station. Mrs. Seviour was twenty-two years of age, and had been married four years, during the last two of which she had lived about a mile from the crossing, in the south part of the village, on the west side of the railroad. Until her marriage she lived with her parents a few rods from the crossing, on the easterly side of the track. Miss Hazen was a nurse, forty-one years old, and had lived at this place twenty years, except that during the last ten years she was away from home about half the time. C. R. Hazen, a brother, lived here with Miss Hazen after the marriage of Mrs. Seviour and the subsequent death of the parents, getting most of his meals at Mrs. Seviour's when Miss Hazen was away. The location of the Hazen house was such that passing trains were plainly visible to its occupants.

The train which caused the injury consisted of the combined engine and observation car Nehasane, and a pay-car. The train as thus made up goes over the road about once a month at irregular intervals, having no schedule time, and not stopping regularly at stations. It did not stop at Chester on this occasion. All passenger trains stop there. There is a crossing at the south end of the station, and another about a third of a mile below. The station signal is one long whistle, and this is required whether there is to be a stop or not. The signal for a crossing consists of two long and two short whistles. The evidence regarding the giving of signals was contradictory. The theory of the plaintiff, as stated in his brief, was that the occupants of the wagon were lulled into security by the giving of the station signal only, and the fact that passenger trains always stopped at Chester.

C. R. Hazen was called by the plaintiff, and testified that he had frequently driven with his sisters, and that they had talked about trains and signals; and after testifying under defendant's exception that there was a difference between the sound of a freight train and a passenger train as it approached, he was asked: "Are you able to distinguish which kind of a train is approaching by the sound?" and this was excluded. Counsel argue that inasmuch as all three had the same opportunities of observation, the knowledge which Mrs. Seviour and her sister had acquired by their observation could be shown by proving what the brother would have known. We think the argument is unsound, and that the question was properly excluded.

This is not like proving whether an object can be seen or a sound heard from a given point. This involved a determination of the understanding which persons of different habits of observation and different capabilities would gain from the same opportunities. It was not a matter to be determined by tests. In the absence of proof of any information directly conveyed to them, the knowledge of the deceased parties was to be inferred by the jury from all that the evidence disclosed regarding them and their opportunities.

The court referred to the crossing signal as required by the law and the rules of the company, and instructed the jury that in determining the issue regarding the giving of the signals they should keep in mind that the burden was upon the plaintiff to make out by a fair balance of evidence that the whistle was not sounded or the bell not rung; and that the rules of the company, introduced in evidence, governing the engineer in this regard, were to be considered with the other evidence in the case, keeping in mind that there was a rule which required the engineer to perform this duty, and the probability of his having discharged his duty; and thereupon submitting the question, ''Do you find by a fair balance of the evidence that the signals were not given?'' The plaintiff excepted to the charge that the jury should keep in mind the rule requiring signals and the probability that that rule was complied with.

The language complained of was not used in charging the jury upon any point of law. The court was dealing with a controverted matter of fact and the evidence bearing upon it. The jury were not told that the matters referred to raised any presumption in favor of the claim that the signal was given. The statement was at most an expression of the court's opinion that the existence of the requirement afforded some support to the testimony of the witnesses who said that the signal was given. There is no legislative provision or judicial holding in this State that bars the court from expressing its opinion regarding the evidence and the weight of the evidence. The right is seldom exercised, but its existence remains unquestioned. The expression must, however, be fair and reasonable, and be accompanied by instructions which plainly leave the determination with the jury. *Sawyer* v. *Phaley,* 33 Vt. 69; *Rowell* v. *Fuller,* 59 Vt. 688, 10 Atl. 853; *Baker* v. *Sherman,* 71 Vt. 439, 46 Atl. 57.

The language excepted to was nothing more than an incidental comment upon one feature of the evidence. The facts that the statute required the giving of the signal, and that a rule of the company directed it, and that it was a stated and frequently recurring duty of the employee, might reasonably be thought by the jury to lend some probability to the claim that it was given on this occasion; and it was within the discretion of the court to suggest these things to the jury as matters proper for their consideration in connection with the testimony of the witnesses. The jury had already been distinctly told that they were to determine the question upon the whole evidence. We think the phrase complained of, in the connection in which it was used, cannot have been misleading. We are satisfied that the jury got from it no impression that they were in any way restricted in determining for themselves the probative value of this evidence.

With reference to the contradictory testimony regarding the giving of signals, the court charged in substance that there was a distinction between positive and negative evidence which should be taken into account; that the first was entitled to greater weight than the last, and that in weighing such evidence they should consider all the surrounding circumstances. The plaintiff excepted to the charge upon this subject, and specifically to the statement in substance that testimony that a person saw or heard a thing was entitled to greater weight than testimony that he did not see or hear a thing. The distinction made by the court is found in text writers of authority, and is judicially recognized in this State. *Bates* v. *Cilley,* 47 Vt. 1; *Farmers etc. Bank* v. *Champlain Trans. Co.,* 23 Vt. 186, 56 Am. Dec. 68. The propriety of charging it depends upon circumstances. To give the instruction in some cases might be legal error. But as applied to this subject matter, and in view of the evidence presented, we think the plaintiff has no ground for complaint. The defendant's evidence tended to show that all the required signals were given. Many of the plaintiff's witnesses regarding signals were men engaged in stores near the station and working in and about mills located near the lower crossing. Some put it that they did not hear any whistle, others that they did not remember of hearing any, others that there was none. Some testified that one long whistle was given, and no other. Common experience has shown that signals regularly and frequently given within the

hearing of persons who have no special interest in them, like the sounding of whistles, the ringing of bells, or the striking of clocks, are quite likely to occur without being noticed.

The main track of the defendant's road from a point south of Chester station to and beyond the crossing where the accident occurred, runs in a straight line on a slightly ascending grade. The victims of the accident were riding northward on a highway which crosses the railroad at an angle of thirty degrees. The main station building is on the westerly side of the track, about 600 feet south of the crossing. The freight house is on the same side of the track, about 480 feet south of the crossing. A traveler from the south reaching a point in the highway about 100 feet from the crossing could see the main track as far south as the station. The horse driven by Miss Hazen was sixteen years old, high spirited, and a good roader. The plaintiff's witnesses placed the speed of the train at from thirty to sixty miles an hour. Defendant's witnesses placed it at from twenty-five to thirty miles. The point of impact was at the hind quarters of the horse.

The only eye witness of the accident produced by the plaintiff was standing about sixty feet westerly from the crossing, in a vacant lot on the opposite side of the highway from the station. He first saw the team when it was about 120 feet from the crossing. It was then jogging along about six or eight miles an hour. The women had their faces turned toward the station, and kept them in that position as they went on. As they approached the crossing, and after the train came in view, at a distance from the crossing regarding which the witness was confused, but which he apparently intended to place about thirty-five or forty feet from it, Mrs. Seviour took out the whip and struck the horse, on which it started ahead and went faster.

The only witnesses to the accident produced by the defendant were occupants of the Nehasane. This engine has an observation compartment constructed over the boiler in front of the engineer's cab. The boiler is covered by a platform which has an elevation of twelve or fourteen inches above the floor, and extends the entire length of the compartment. There is a row of three chairs on each side of the compartment, and an aisle on each side between the chairs and the platform. On this occasion the front chair on the right was occupied by Hewitt,

supervisor of track, and the chair opposite by Burton, supervisor of bridges. Aldrich, the conductor, sat behind Burton. In the floor at the left of Hewitt, standing about an inch and one-half above the surface, was a pedal by means of which the engineer could be signaled. This was six or seven feet from Burton, and separated from him by the platform. There was no other appliance in the compartment for signaling the engineer.

Hewitt testified that after they had passed the freight house some little ways he noticed a team approaching the crossing; that as it neared the crossing they pulled up as if going to stop and then whipped the horse; and when asked how near the team was to the crossing when this happened, said approximately fifty or sixty feet. Inquired of in cross-examination, the witness said that when he first saw the team the train was probably 250 or 300 feet from the crossing and the team fifty or sixty feet from it; that the team was jogging along probably six or eight miles an hour; that when they whipped the horse the train was probably 100 feet from the crossing and the team twenty feet from it. His testimony throughout was that when they whipped the horse he immediately signaled the engineer to stop, and that until then he had no idea that they were intending to cross.

Burton testified that he first noticed the team when the train was a little north of the freight house; that the team was then probably ninety or 100 feet from the crossing; that when he first saw them they were jogging along, and immediately afterwards, probably a few seconds, they seemed to become excited, and both leaned forward and began whipping the horse; that when they began to whip up they were probably thirty or forty feet from the crossing; and said further on cross-examination that when they began to speed up the train was 350 to 400 feet from the crossing. Aldrich testified that the windows of the Nehasane open from the top; that in passing Chester station he was standing up with his head out of the window, looking for signals; that on taking his seat, when the train was possibly 100 feet from the crossing, he looked past Burton through the window and saw a wagon close to the crossing, not over thirty or forty feet from it, with the occupants apparently urging the horse forward; and that fearing a collision, with pieces coming through the windows, he went over backwards and lay on the floor;

8

that when he saw the women nothing had been done to stop the train.

The fireman, whose place was on the side from which the team was approaching, was attending to his fire at this time. The engineer testified that when he got the signal he was on his seat with his head out of the side window, looking ahead; that he immediately brought in his head, and shut off the steam and applied the emergency brake. In cross-examination he was inquired of about sanding the rail, and said that it was not done—that he did not have time to do it; and that he knew of no appliance by which you could sand the rail and pull the brake at the same time; that sanding the rail would help somewhat—he could not say how much. Nothing further appeared regarding this. The train stopped 640 feet from the crossing. The plaintiff introduced a witness who had been an engineer three years and a half, who testified that a train like this on such a grade when going forty or even fifty miles an hour ought to be stopped by an application of the emergency within 400 feet, and that going sixty miles an hour it could probably be stopped in 600 feet. It appeared from his further testimony that a heavy train can be stopped quicker than a light one; that he had used the emergency but once, and did not then observe how far the train went; and that his judgment was based upon his general experience in running trains.

The plaintiff submitted three requests which called for instructions upon the doctrine of the last clear chance. These requests were refused, and no charge upon the subject was given. It is not necessary to inquire as to the technical or substantial accuracy of the requests as framed. There was no evidence fairly and reasonably tending to show that the death of Mrs. Seviour was due to any failure on the part of the defendant's servants to do what they could to save the occupants of the wagon from the moment it was realized that they were placing themselves in peril by attempting to cross the track.

*Judgment affirmed.*