## LEHIGH VALLEY R. CO. v. MANGAN.

(Circuit Court of Appeals, Second Circuit. December 14, 1921.)

No. 43.

1. **Evidence** ⟜586(2)—**Testimony signals were sounded is contradicted only if witnesses denying them were in position to hear.**

Where witnesses for the defendant testified that warning signals were sounded as required by the company's rule, testimony by witnesses for plaintiff that they did not hear such signals raises no conflict for submission to the jury, unless it clearly appears that those testifying they

did not hear were in such a position and were giving such attention that they probably would have heard, if the signals had been sounded.

2. **Trial ⬤⟿139 (1)—Sounding of signals held question for jury.**

Employees of the same train crew as deceased, who were either close to the track where deceased was, or were on an engine just starting on an adjoining track, were so situated that they could have heard signals of the train which struck deceased, if they had been sounded, though the engine on which they were was making considerable noise while starting, since the signals could have been heard at the intervals between the puffs, so that the testimony of such witnesses that they did not hear the signals raised a question for the jury as to whether they were sounded as testified to by other witnesses.

3. **Appeal and error ⬤⟿995—Weight of testimony signals were not sounded is for the jury.**

The weight of testimony of witnesses, so situated that they probably would have heard warning signals, that they did not hear such signals, is a question for the jury.

4. **Trial ⬤⟿258 (1)—Request must give understanding of law applicable to facts.**

A request to charge must be calculated to give the jury an accurate understanding of the law applicable to the circumstances of the particular case.

5. **Master and servant ⬤⟿216 (6)—Risk of violation of rules by trainmen not assumed.**

A freight train conductor, walking on an adjoining track alongside an engine of his train, which was just starting, to see whether a defect in the engine had been removed, did not assume the risk of a violation by the crew of another train of the rule requiring signals to be sounded while passing a standing train.

6. **Master and servant ⬤⟿295 (6)—Charge on assumption of risk by conductor held properly refused.**

Where the negligence alleged to have caused the death of a conductor was failure to sound the signals required by the company's rules, a requested charge on assumption of risk by the conductor, which omitted to state that he did not assume the risk of violation of its rules, was properly refused.

Hough, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Action by Beatrice Mangan, as administratrix, etc., of Thomas Mangan, deceased, against the Lehigh Valley Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

The plaintiff in error was defendant below, and is hereinafter referred to as defendant. The defendant in error was the plaintiff below, and is hereinafter referred to as plaintiff. The plaintiff brought this action as the administratrix of her deceased husband, suing, on behalf of herself as widow and her three infant children, to recover damages for the negligent killing of Thomas Mangan the husband and father. The action was brought under the federal Employers' Liability Act (Comp. St. §§ 8657–8665).

The defendant is a corporation organized under the laws of the state of Pennsylvania, and operates a railroad within the state of New York. The decedent at the time of his death was in the defendant's employ as a conductor in charge of a freight train. The complaint alleges that on August 24, 1917, the plaintiff's intestate was struck by one of defendant's trains near Gardner's run, in the state of Pennsylvania, and sustained injuries which caused his death. It is also alleged that at the time before mentioned the intestate

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and the defendant were engaged in interstate commerce, and that his death was due to the negligence of the defendant, its agents, officers, and employees, and was not due to any negligence of the decedent. The defendant in its answer set up, among other defenses, those of contributory negligence and assumption of risk.

It appears that Mangan had been in the employ of the railroad for 20 years before his death, during 14 years of which he had been a conductor. His death occurred under the following circumstances:

On August 24, 1917, he was the conductor in charge of a freight train which was at a place called Gardner's Run, in Pennsylvania. At that place the railroad maintained two separate tracks running parallel and about four feet apart. One of these tracks was devoted to west-bound and the other to eastbound traffic. Mangan's train was bound east up the mountain. It consisted of about 45 cars, a "leader engine pulling the train" and a "pusher engine" pushing it at its extreme rear. While the train was working its way up the mountain, it stopped because a piece of brick of the arch got in between the two sections of the grate of the rear or "pusher" engine, tipping one grate. This was about 7:30 in the evening and it was getting dark. Mangan was assisting in getting the engine ready to start. The trouble with the engine was all on the side of it next to the west-bound track, and in making the repairs, adjustments, or observations in relation to the trouble with it, it is claimed that it was necessary to do so from the side of the engine abutting on that track.

Mangan's train was stopped to permit an adjustment of the fire grate, a clinker having become lodged in it, thus preventing its closing, and thereby permitting burning coals to fall through. The adjustment of the grate was made by one of the crew operating a wrench or shaker bar from the cab of the engine, thereby opening and closing the grate in the familiar manner of "shaking" a stove or furnace. One or two other members of the crew, including the decedent, stood on the ground between the east-bound track and the west-bound track, watching to see if and when the obstruction should be dislodged. The train was delayed about half an hour while the adjustment was being made. When the adjustment was completed and they were ready to proceed, the engineer upon a signal from a brakeman, who was over on the right-hand side of the engine, moved his engine forward up to the rear end of the standing freight train, blew two long blasts of his whistle as a signal to the head engineer that he was ready to proceed, and started pushing up the slack of the standing train. Meanwhile "the blower" on the engine was being used to raise the pressure of steam, and the engine was making a great deal of noise in the effort to push forward the 45 standing freight cars, thereby taking up the slack, as the cars had been standing without the brakes being set. As the pusher engine moved forward, the decedent and one of the other employees, who had been on the ground beside the engine, watching the attempts to shake out the obstruction in the grate, moved forward with the engine; the decedent stepping over and walking between the rails of the west-bound track. As the pusher engine was in the act of pushing forward the slack of the standing freight train, a train consisting of an engine and 10 empty Pullman cars came from the east on the west-bound track at a speed of about 30 miles an hour and struck decedent, causing his death.

The accident occurred on a line of the defendant's road known as "the mountain cut-off." This cut-off was a much-used line at the time, there being upwards of 20 trains a day each way. These included three scheduled trains and about 20 so-called "extras," all freight trains being styled "extras"; and in addition at times unscheduled trains of passenger cars were run over the line. The negligence claimed on the trial was that no warning was given of the approach of the train on the west-bound track, either by the blowing of a whistle or the ringing of a bell, although a rule of the defendant required the bell on the engine to be rung while passing a standing train.

Three railroad employees, who it was claimed, were all in a position to hear the bell if it had been rung, and whose hearing was good, testified that they neither heard any bell rung, nor any whistle blown, nor any signal or warning given of the approach of the train, but that it was run upon Mangan without any notice whatever of its approach. Three witnesses called by the

defendant, and who were in the employ of the defendant and were on the west-bound train, testified that the bell of the engine drawing the west-bound train was ringing constantly as it passed the freight train; and two other witnesses, employees of the defendant, testified that as the train passed they heard two long and two short blasts of the whistle blown.

The jury found a verdict for the plaintiff in the sum of $16,000.

Allen McCulloh, of New York City (Clifton P. Williamson, of New York City, of counsel), for plaintiff in error.

Austin Flint Gibbons, of New York City (John C. Robinson, of New York City, of counsel), for defendant in error.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The defendant claims that an error was committed in leaving it to the jury to find whether the engine on the west-bound track in passing the freight train blew its whistle or rang its bell. It is said that there was no such conflict of testimony as warranted the submission of any question to the jury. In calling attention to the testimony as to the blowing of the whistle, the District Judge told the jury that, putting himself in their place, he thought he should conclude that the whistle was in fact blown. He added:

"I can see no reason to discredit the testimony of the crew of the leader engine, but it seems to me that it might well have been owing to the noise of the exhaust that the whistle was not heard by the others who were very close to the whistle itself. But that is a question which I do not take from you. It is a question of fact for your decision. It is perhaps conceivable that between the puffs of the engine the sound of the whistle would be heard if it had been blown."

As to the ringing of the bell he said:

"The question on which most emphasis was made by the plaintiff is the question of the bell itself, and on that the testimony of the leader crew is silent. Apparently they did not hear the bell as it passed. The crew of the passenger engine, as you will remember, did testify that the bell was ringing, and was ringing from the mountain top down. The question of fact as to whether that was done or not I leave entirely to you, without any indication as to my judgment of mind upon the subject."

[1] If the witnesses who testified that the bell was not rung or the whistle sounded were so located that they would probably have heard either the one or the other, it was proper to submit their testimony to the jury. Chicago & N. W. Ry. Co. v. Andrews, 130 Fed. 65, 70, 64 C. C. A. 399. It is, of course, conceded to be an established principle of law that, where witnesses who were in a position to hear testify affirmatively and positively that they did hear a bell or whistle, the testimony of other witnesses that they did not hear it raises no conflict of testimony for submission to a jury unless it clearly appears that those who say they did not hear were in such a position, and were giving such attention that they most probably would have heard the sound had it occurred. Northern Pacific R. R. Co. v. Freeman, 174 U. S. 384, 394, 19 Sup. Ct. 763, 43 L. Ed. 1014; Stitt v. Huidekoper, 17 Wall. 384, 394, 21 L. Ed. 644; Foley v. N. Y. Central & H. R. R. R., 197 N. Y. 430, 432, 90 N. E. 1116, 18 Ann. Cas. 631.

[2] The witness Thomas, who saw the accident, was standing close to the track as the west-bound train passed, and who said his hearing was excellent, testified as follows:

"Q. What was the first you knew of the approach of this train, the very first that you knew of the approach of this train which ran Mangan down? A. Just while it was on me, that is all. Q. Did you hear any bells sounded on that train? A. No, sir.

"Q. Did you hear any signal of any kind given of its approach? A. No, sir."

The witness Earley, who at the time of the accident and at the time of the trial was in defendant's employ, and had been for 14 years, and was the engineer of the pusher engine on Mangan's train, testified as follows:

"Q. Do you remember a train passing you there at that time? A. There was a train that passed us there, yes, sir.

"Q. While you were standing there? A. Just as we were starting our train.

"Q. Did you hear any sound from that train, any bell, or whistle, or warning, or signal of any kind? A. No, sir.

"Q. Did you see it pass you? A. I just heard the noise of a passing train, and took no particular attention to it, and paid no attention to it."

The witness Dougherty, a trainman on Mangan's train, who was at the window in the caboose at the rear of the train on the side on which the west-bound train passed, and who saw it pass, testified as follows:

"Q. Did you hear any bells sounded on that train? A. No, sir.

"Q. Any whistle blown on it? A. No, sir.

"Q. No signal of any kind of its approach? A. No, sir."

It is impossible for the court to say that these men were not so situated that they could not have heard the blowing of the whistle or the ringing of the bell, if either had occurred. Counsel laboriously argued that the noises around the spot where Mangan was killed at the time he was killed would have precluded Earley, Dougherty, Thomas, and Mangan from hearing any bell, even if it had been rung. The noises which would have so precluded them, he argued, were the blower on the pusher engine, and the intermittent puffing sounds of the engine, ordinarily made when an engine is started up. The argument has not convinced us. The clanging of a bell continuously rung for a distance of more than 1,700 feet, as the rule required, should have been distinguished, if not above the puffing of the engine of Mangan's train, certainly between the puffs which the testimony shows were intermittent with intervals between them.

[3] It may be that these witnesses were mistaken, and that the bell was in fact rung; but that we think was, as the court below held, a question for the jury. The question for us is whether these witnesses were so situated that they would probably have heard the sound if the bell had been rung, and we think they were, and therefore that their testimony was entitled to be submitted to the jury, and its weight was to be determined by them. The weight of the testimony was exclusively for the jury, and this court has no right to pass upon it.

But it is said that the decedent assumed the risk. At the instant he was struck he was in the line of his duty giving his attention to the disabled engine of his own train, in order to make it safe for him

to proceed with it. He was in charge of the train, and at the time he was struck was watching the grate to see if it was functioning, and was not sure that the defect had been remedied. It seems to have been necessary, in order to make his observations, that he be on the side of his engine that abutted upon the other track. The space between the side of his engine and the side of the passing engine, at the time it struck him, was not more than 2½ feet, owing to the overhang of both engines, due to the curving of the track at that point. The grate he was observing was under his engine on its left side, so that, in order to observe its action, he was necessarily obliged to stand off from the left side of the engine a little distance. He knew that the entire length of his standing train, consisting of its locomotive and 45 cars stretching out on the east-bound track for a distance of about 1,700 feet, was between him and any train that might approach on the west-bound track, and he had the right to assume that the rule promulgated for his protection in just such a situation would be complied with by those operating an approaching train. That rule directed that "the engine bell must be rung * * * while passing trains on adjacent tracks." If the rule had been obeyed, the bell on the engine which struck him would have been clanging continuously from the time that engine was nearly one-third of a mile away up to the instant that it struck him. At the rate it traveled—30 miles an hour—its clanging would have gone on continuously for 40 seconds before he was struck, bringing its warning nearer to him every moment, and giving him ample time to step out of the path of the approaching engine, which would have required not more than the fraction of a second. Whatever noises were made by his own engine were intermittent, and the bell, if it could not be heard above the puffing, ought to have been heard in the intervals between the puffs.

In going upon the west-bound track under the circumstances, did Mangan assume the risk of being struck by a train running over that track? The court below was of the opinion that the doctrine of assumption of risk was not applicable to the case, and, so stating, declined to give a request on that subject made by the counsel for the defendant. The court then said that he would give any of the defendant's requests on that subject which the counsel of the plaintiff assented to. As the plaintiff's counsel stated that he had no objection to the following portion of the requests they were given:

"II. If the noise, at the place where Mangan was, was such that the danger of the approach of a train moving at the rate of 30 miles an hour and sounding its bell, without being heard by him, was so obvious that an ordinarily prudent person would have known and appreciated that danger, Mangan must be held to have known and appreciated it, and to have assumed it.

"III. If you believe that the immediate or proximate cause of the decedent's death was his own failure to exercise reasonable care for his own safety, the verdict must be for the defendant. 'Reasonable care,' in this connection, means doing or omitting to do what an ordinarily prudent and cautious man of the age, knowledge, and experience of the man in question would have done or omitted to do under the circumstances."

But counsel did not assent to the following, and they were not given:

"I. Some employments are necessarily fraught with danger to the workman —danger that must be and is confronted in the line of his duty. Such dangers

as are normally and necessarily incident to the occupation are presumably taken into the account in fixing the rate of wages. And a workman of mature years is taken to assume risks of this sort whether he is actually aware of them or not. When a employee knows and appreciates the risk and danger incident to his voluntarily placing himself in a certain position in the course of his employment, he is deemed to assume the risk of injury.

"Therefore, if you find that the decedent, Thomas Mangan, knowing the use which was commonly made of the west-bound track at the point in question, placed himself upon that track under conditions where he probably could not hear a bell and approaching engine, then you may find that he assumed the risk of being struck without warning by an approaching engine, and if his death came about through the conditions, the dangers of which he assumed, the verdict must be for the defendant."

The failure to give the omitted portion of the request is assigned for error.

[4] A request to charge must be calculated to give the jury an accurate understanding of the law applicable to the circumstances of the particular case. Erie Railroad v. Purucker, Adm'x, 244 U. S. 320, 324, 37 Sup. Ct. 629, 61 L. Ed. 1166. What was said by the court in the Purucker Case shows very clearly that an instruction that a man who goes for his own convenience and voluntarily upon the tracks of a railroad at the time of its being used as a highway of interstate commerce thereby assumes the risk of so using the tracks is too broad, and omits elements which are essential to make the assumption of risk doctrine applicable to the case.

[5, 6] The only negligence charge against the defendant was that it failed to give any warning of the approach of the train which killed the defendant, and especially that it violated its own positive rule requiring that the engine bell should be rung while the engine was passing a train on an adjacent track. Mangan did not assume the risk of any injury arising from the failure to obey that rule; and any instruction as to assumption of risk should have made that fact clear. Neither do we think that under the circumstances it could properly be said that Mangan was on the track voluntarily and for his own convenience. It seems to us that he was there in the discharge of his duty and because it was necessary for him to be there.

The charge as to the assumption of risk which was given, assuming that the doctrine of assumption of risk was involved, was as favorable a charge as the defendant was entitled to. The court was justified in declining to charge in the exact language of the appellant's request, which would have confused and misled the jury.

Judgment affirmed.

HOUGH, Circuit Judge (dissenting). Not only did the learned trial judge refuse the request copied in the opinion of the court, but added, apparently within the hearing of the jury, "I think there is no question here of the assumption of risk, so I will decline any charge on assumption of risk." After this ruling he did charge such of defendant's requests as plaintiff had no objection to.

To hold with the plaintiff that there was no question of assumption in the case, and then charge only what the plaintiff did not object to, cannot in my judgment be called a ruling conformable to Anzolotti v. McAdoo (D. C.) 262 Fed. 568.

The rulings on negligence, contributory and otherwise, are consistent with the more recent decisions of this court; wherefore I dissent only in respect of the treatment of assumption of risk.