GRACE LEFEBVRE'S ADMR. *v.* CENTRAL VERMONT RAILWAY Co.

November Term, 1925.

Present: WATSON, C. J., POWERS, TAYLOR, SLACK, and BUTLER, JJ.

Opinion filed May 5, 1926.

*Railroads—Signals at Grade Crossings—G. L. 5173—Burden of Proof as to Whether Crossing Signals Given—Evidence—Testimony That No Signals Were Heard—Jury Question—Defendant Responsible for Evidence That Statutory Signal Not Given Cannot Object That Evidence Is Negative and of No Probative Value—Trial—Exception to Failure of Court to Charge—General Exception—Sufficiency of Evidence To Support Verdict.*

1. Blowing of whistle by locomotive approaching grade crossing when 80 rods therefrom, but not thereafter, and ringing of bell of locomotive at same point and thenceforward until crossing was passed, *held* a compliance with G. L. 5173 as to ringing of bell, but not with respect to blowing whistle.

2. In action against railroad company to recover for death of one killed in collision at railroad grade crossing, while riding in an automobile as a guest, plaintiff has burden of showing defendant's noncompliance with requirements of G. L. 5173 relating to signals to be given.

3. In such action, where occupants of such automobile testified that in approaching such grade crossing, they watched and listened for an approaching train, and their position was such that they would probably have observed fact if statutory signal had been given, testimony of each that he did not hear any whistle blow or bell ring was not merely negative in character but strong evidence that no such signals were given.

4. In such action, whether statutory signals by blowing of whistle of locomotive or ringing of its bell were given, *held* question for jury.

5. In such action, testimony of conductor of train colliding with automobile that he did not hear any whistle blown or bell rung for crossing where accident occurred, in view of his other testimony, *held* more than merely negative, and proper for consideration of jury.

6. In such action, testimony of witnesses approaching crossing where accident occurred, in another automobile than one struck by train, that they did not hear sound of any whistle or bell from engine or train, *held* more than merely negative, and for consideration of jury, where evidence showed their position to be such that they would be more likely than otherwise to hear such signals if given.

7. In such action, testimony of witness that he did not hear whistle blown or bell rung as train approached crossing where accident occurred, *held* proper for consideration of jury, notwithstanding his testimony that he did not listen for such signals, where his position was such at the time that, in the circumstances, it is reasonably probable that he would have heard either signal if given.

8. In such action, testimony of witness for defendant that he did not hear bell rung as train approached crossing where acci-.

dent occurred, *held* proper for consideration of jury, where his position was such at the time that, in the circumstances, it was reasonably probable that he would have heard such signal if given.

9. In such action, where several of defendant's witnesses when testifying, either in chief or on strict cross-examination, stated in substance that they did not hear any bell ringing from engine of train approaching crossing, defendant being thus instrumental in such evidence being in case, cannot object to its use as negative and of no probative force.

10. Exception to failure of court to instruct jury that in determining whether statutory signals were given when train was approaching grade crossing, they should disregard testimony of any occupant of automobile struck by train, that she did not hear signals, but who did not say she was listening, and in respect of whom there was no evidence as to how her sense of hearing was engaged, *held* without merit, no such witness being shown by record.

11. Exception to failure of court to charge that, in determining question respecting whether statutory signals were given when train was approaching grade crossing, jury should disregard testimony of any witness testifying that he did not hear any such signal, in respect of whom evidence showed that at the time his sense of hearing and his mental faculties were otherwise absorbed and engaged, *held* too general to be availing.

12. Evidence *held* to justify jury's finding in special verdict that statutory crossing signals were not given.

ACTION OF TORT for negligence. Plea, the general issue. Trial by jury at the September Term, 1924, Washington County, *Willcox,* J., presiding. Verdict and judgment for the plaintiff. The defendant excepted. The opinion states the case. *Affirmed.*

*J. W. Redmond* and *Horace H. Powers* for the defendant.

*Theriault & Hunt* for the plaintiff.

WATSON, C. J.   When this case was here before (97 Vt. 342, 123 Atl. 211), the theory of the plaintiff was that the highway over which the decedent, Grace LeFebvre, was riding at the time of the collision in question at the crossing at Riverton station

was regularly laid out and four rods wide. The theory of the defendant then was that the highway there was one established by user, dedication, or adoption, and that its width was only such as had become fixed by user. At the second trial, the record of which is now before us for review, the theory of both parties was that said highway at that place was of the latter character and that its width was limited by the actual occupation and use. The court so instructed the jury without objection. For the other general facts of the case reference is made to the opinion before rendered, in which they are fully stated.

The record treats defendant's main line as running north and south at the point of the accident, and the highway that crosses said main line just north of the passenger station as running east and west. The passenger station building is on the east side of said main line, and south of the highway. As stated in the former opinion (97 Vt. 342, 347, 123 Atl. 211, 213), "East of its main line, the defendant maintains a spur siding, which branches off at a point about thirty rods north of the station and runs southerly, at varying distances from the main line, to and a little beyond the station, crossing the highway at a point about thirty feet from the main line, and passing east of the station." The distance between the east rail of the main line and the west rail of the side track is 35 feet. It appears that the highway east of the railroad runs generally at right angles with it; but immediately west of the crossing the highway in fact bears to the right toward the line of the railroad, thence running northerly at approximately forty-five degrees with it.

The plaintiff charges the defendant with four grounds of negligence stated by the trial court in charging the jury as follows: First: That the defendant failed to give the signals required by law to be given by a locomotive engine in approaching a railroad crossing—that is, failed to give the signals by whistle or bell. Second: That the defendant, in view of all the conditions present at the crossing, operated the train in question on the occasion in question at an unreasonable rate of speed. Third: That the defendant maintained a ramp connected with the north end of the cinder platform, and that that ramp with its supporting timber on its west extended northerly into the limits of the highway, and that that platform and ramp constituted such an obstruction in the highway as to impede the movement of the automobile driven by (George) Bardis, and thereby

24

caused said automobile to become stalled in the path of the on-coming train, resulting in the accident. Fourth: That the de-fendant failed to discharge its duty in respect to maintaining a crossing at the intersection of the highway in question, and care-lessly and negligently failed to maintain its railroad in a reason-able manner for its own use at said crossing and for the use of travelers over said highway.

The jury returned a general verdict for plaintiff to recover $6,500, and returned special verdicts as follows:

(A)    "1.    Do you find that the defendant failed to give the statutory signal either by whistle or by bell? Answer: Yes.

2.    Was such failure the proximate cause or a part of the proximate cause of the accident? Answer: Yes."

(B)    "1.    Do you find that the defendant operated its train on the occasion of the accident at an unreasonable speed in view of the existing conditions at the crossing? Answer: No.

2.    Was such speed the proximate or a part of the proximate cause of the accident? Answer: No."

(C)    "1.    Do you find that the ramp, or a part of it, consti-tuted an obstruction impeding travel in the highway? Answer: No.

2.    Was such obstruction the proximate cause or a part of the proximate cause of the accident? Answer: No."

(D)    "1.    Do you find that the defendant failed to maintain its railroad at the crossing in a reasonable manner for the accommodation, safety and convenience of public travel? Answer: Yes.

2.    Was such failure the proximate cause or a part of the proximate cause of the accident? Answer: Yes."

After verdict, and before judgment, defendant filed motions as follows:

"1.    To set aside the fourth special verdict, the one in respect of the sufficiency of the main line grade crossing and its causal relation to the accident, because, on all the evidence in the case, and especially in view of the Third Special Verdict, the one in respect of the *Ramp*, and its causal relation to the accident, etc., *as matter of law*, no condition of the grade crossing at the main line for which defendant was legally responsible could have had any causal relation to the happening of the accident.

"2.    To set aside the First Special Verdict, the one in respect of the issue as to whether the engine bell was rung

as the statute requires, because, *as matter of law,* the jury were not justified in finding that plaintiff has sustained the burden of proof that rested on him as to that issue; and, as *matter of law,* on all the evidence in the case, there is not room for opposing inferences, there is not room for reasonable minds to differ on the proposition that plaintiff has not sustained the burden of proof resting on him in respect of that issue, and so the jury, *as matter of law,* were not justified in finding as recited in said Special Verdict.

"3.    To enter judgment for defendant to recover its costs, because, for the combined reasons specified in the above paragraphs numbered 1 and 2, and in view of the Four Special Verdicts, defendant is entitled, *as matter of law,* to have judgment rendered in its favor on the General Verdict, viewed in the light of the Four Special Verdicts and of all the evidence in the case."

These motions were denied, to which denial defendant excepted; and judgment was entered for plaintiff to recover of defendant $6,500, to the rendition of which judgment defendant excepted.

The first point argued in defendant's brief is that its motion to set aside the first special verdict should have been sustained. As stated in the brief, this raises the question of law as to whether there was any evidence in the case to sustain the finding that defendant failed to give the statutory signals either by whistle or bell; and that such failure was the proximate cause or a part of the proximate cause of the accident.

[1, 2]    Numerous witnesses, called by defendant, including the engineer and fireman of the train in question, gave positive testimony tending to show that the whistle of the locomotive engine was blown at the whistling post at least eighty rods north of the crossing, and that the bell of the engine was rung at the same point, and thenceforward automatically kept ringing until the train was stopped after the accident.    No claim was made by defendant, nor did its evidence tend to show, that the whistle was blown other or later than as just stated.    Such blowing of the whistle did not answer the requirements of G. L. 5173; but if the bell was rung as defendant's evidence tended to show, this was a compliance with the provisions of that statute.    *Howe* v. *Central Vt. Ry. Co.,* 91 Vt. 485, 101 Atl. 45; the instant case, 97 Vt. 342, 123 Atl. 211.    The burden was with the plaintiff to show defendant's noncompliance with the law in this respect.

On the question so presented plaintiff introduced, without objection, the testimony of several witnesses as follows: George Bardis, a man about thirty years of age, the owner of the automobile used on the occasion in question and then driving it, testified that he knew there was a railroad crossing at the place of the accident; that between that place and a point some east of the covered highway bridge over Dog River about thirty rods east of the main line, the speed of the automobile was from ten to twelve miles an hour; that as he left the bridge he listened for a whistle or a bell on any train; that as he went along from the bridge toward the railroad crossing, he could not see up the railroad track, his view being hidden by Davis Brothers' stone sheds; that beyond those sheds was Davis Brothers' office, and beyond that office, going west, was the side track of defendant's railroad; that as his automobile went by the Davis Brothers' office, the witness looked to the right and left for trains, but saw none to the right; that after he went by the side track he still looked to see if there was any train coming, at the same time listening; that the witness, as he sat in his car, was about fifteen feet from the main line when he first saw the locomotive coming, up to which time he had not heard any whistle, nor any bell, nor warning of any kind from an approaching train; that when he saw the locomotive first, as just stated, there was not any sound of a ringing bell coming from it that witness heard; that he was attentive to the locomotive when he saw it, and attended to it.

It appeared that on that occasion there were beside Bardis, riding in his car, Miss Anna J. Wilfore, who by marriage was Mrs. Anna J. Carbrey at the time of the trial below (a sister of the plaintiff's intestate,) sat on the front seat next to Bardis on his right, and on the extreme right of the seat sat Mrs. Edith Blodgett, a domestic in the Bardis family; that in the left end of the rear seat sat Mrs. Mary Bardis, the wife of the driver, in the center of the seat sat plaintiff's intestate, with her little boy Donald in her lap, and next to her in the extreme right of the seat sat her daughter, Glenna LeFebvre.

Mrs. Bardis testified that as the car went along from the bridge up to the track where the accident occurred, there was no talking on the back seat; that she did not hear any whistle from that train, nor did she at any time hear a bell from it.

"Q.    Did you hear any bell or whistle or any kind of warning, giving you notice of the approach of that train?
A.    No, I didn't.
Q.    You say you saw the engine when it passed your car?
A.    Yes.
Q.    Did you hear any bell ringing on that engine when it went by?
A.    No.
Q.    As you passed along up from the bridge did you look for a train?
A.    Yes, we did.
Q.    And did you listen for a train?
A.    Yes, we did.
Q.    Do you know—did you see Mrs. LeFebvre doing anything in that respect?
A.    Yes, we all looked.
Q.    You were all looking?
A.    Yes.
Q.    And listening?
A.    Yes."

Mrs. Carbrey testified that as the automobile approached the railroad crossing she did not hear any whistle from that train, and did not hear nor had she heard any bell ringing from it; that as they approached the railroad crossing from the bridge, there was not any talk on the front seat; that she had been over that road before and knew there was a railroad track and a crossing there.   She further testified:

"Q.    Whether or not you were looking and listening for a train?
A.    Yes, I was.
Q.    Did you hear any train coming or any warning or signal of any kind until after you passed the coal car and saw the train itself?
A.    No.
Q.    Did you observe what Mr. Bardis did, if anything, as to looking for the train, in watching out, approaching that crossing?
A.    He was looking toward the crossing.
Q.    Was he doing anything else than paying attention to his driving and watching out?
A.    No."

Mrs. Blodgett testified that from the covered bridge to the railroad track there was no talking or noise in the car; that she did not at any time hear any sound from whistle or bell, or get any warning of the approaching train, and did not see or have any knowledge of it until she saw the front end of the engine "Somewhere around Provost's shed." It is said in defendant's brief that "there was no evidence that she was listening, nor how her mind and senses were engaged, except that she was facing the center of the automobile." But this statement is hardly borne out by the record; for, as before seen, Mrs. Bardis testified that all the persons riding in the automobile *were looking and listening for a train.* And this was evidence tending to show that Mrs. Blodgett's attention was directed to the fact of such train signals at the time. Her testimony, therefore, that she did not hear the sound of either whistle or bell, stands in law like that of the other persons riding in the car at the same time, whose testimony to the same effect is noticed above.

[3] According to the tendency of the evidence, not only did each of those witnesses watch out and listen for any approaching train, but their position was such that they and each of them would probably have observed the fact had such signal been given. In such circumstances the testimony of each that he (or she) did not hear any whistle blow or bell ring was not merely negative in character. *Quigley* v. *Canal Co.,* 142 Pa. 388, 21 Atl. 827, 24 A. S. R. 504; *Cox* v. *Schuylkill Valley Trac. Co.,* 214 Pa. 223, 63 Atl. 599; *Johanson* v. *Boston & Maine R. R.,* 153 Mass. 57, 26 N. E. 426. The attending circumstances were such as to make their testimony in this respect strong evidence that no such signals were given. *Slattery* v. *New York, New Haven & H. R. R. Co.,* 203 Mass. 453, 89 N. E. 622, 133 A. S. R. 311. In *Winterbottom* v. *Philadelphia B. & W. R. Co.,* 217 Pa. 574, 66 Atl. 864, the court said: "The opportunity of the witness for hearing the signals, the place where he was located at the time, whether he was on the lookout for the train and listening for the signals, are all important matters to be taken into consideration by the trial judge when he is called on to pass upon the question." In *Menard* v. *Boston & Maine R. R.,* 150 Mass. 386, 23 N. E. 214, it is said: "Ordinarily, all that a witness can say, in such a case, when called to prove that a bell was not rung, is that he did not hear it. Such a statement, with no accompanying facts, is merely negative, and of no value as evi-

dence.   But attending circumstances may be shown which make the statement strong affirmative evidence.   It may appear that all the attention of which the witness was capable was concentrated on the effort to ascertain whether the bell was rung, and his failure to hear it could only have been because it made no sound.   A witness may be in any conceivable attitude of attention or inattention, which will give his evidence value, or leave it with little or no weight; but where his position is such that the sound would have been likely to attract his attention if the bell had been rung, his failure to hear it is some evidence that there was no ringing.''   It was further there said that the witnesses were riding at great risk to their lives if they failed to notice such signals as they heard, and therefore they ''would certainly be expected to attend carefully, and to know whether there was any warning to apprise them of danger.''   In *Northern Pacific R. R. Co.* v. *Freeman,* 174 U. S. 379, 43 L. ed. 1014, 19 Sup. Ct. 763, the accident in question occurred at a highway crossing at a point where the highway crossed the railway track (as in the instant case) nearly at right angles.   It was there said by the Supreme Court of the United States, speaking through Mr. Justice Brown, ''There was testimony from several witnesses in the neighborhood tending to show that no whistle was blown by the engineer as the train approached the crossing.   There was also the testimony of the conductor, engineer, and fireman that the whistle was blown.   As a majority of plaintiffs' witnesses were so located that they would probably have heard the whistle if it had been blown, there was a conflict of testimony with respect to defendant's negligence which was properly left to the jury.''   In *Lehigh Valley Ry. Co.* v. *Mangan,* 278 Fed. 85, the United States Court of Appeals (2nd Circuit) said:   ''It is, of course, conceded to be the established principle of law that, where witnesses who were in a position to hear testify affirmatively and positively that they did hear a bell or whistle, the testimony of other witnesses that they did not hear it raises no conflict of testimony for submission to a jury unless it appears clearly that those who say they did not hear were in such a position, and were giving such attention that they most probably would have heard the sound had it occurred.''

Professor Wigmore, discussing what he calls *negative knowledge,* says:   ''But there is no inherent weakness in this kind of knowledge.   It rests on the same data of the senses.   The only

requirement is that the witness should have been so situated that in the ordinary course of events he would have heard or seen the fact had it occurred." Wig. Ev. (2nd ed.) § 664.

The holdings of this Court regarding such evidence are in principle substantially as stated above. In *Lincoln* v. *Hemenway,* 80 Vt. 530, 69 Atl. 153, it was held that evidence of this character is admissible when the circumstances were such that the witness would probably have heard the event had it occurred; that "it is not admissible unless there is this probability. The degree of probability must necessarily be left largely to the discretion of the trial court." And in *Barney's Admx.* v. *Quaker Oats Co.,* 85 Vt. 372, 82 Atl. 113, we said that such testimony should not be received where it affords a mere basis for speculation and conjecture and not ground "for a reasonable probability." The doctrine of these cases thus stated was applied in *Comstock* v. *Jacobs,* 84 Vt. 277, 78 Atl. 1017, Ann. Cas. 1913A, 679.

[4]    On principle and authority it therefore follows that the testimony of the several witnesses named above was for consideration by the jury in determining whether the statutory signal by the blowing of the whistle or the ringing of the bell was given.

There is yet to be considered testimony to the same general effect given by witnesses called by defendant, either in their examination in chief or in cross-examination.

Edward J. Muldoon, the conductor of the train involved in the accident here in question, was called as a witness by defendant. From his testimony in chief it appears that he had been a conductor for sixteen years; that the last stop of the train in question north of the place of the accident was Montpelier Junction, leaving there at 4:40 p. m.; that the train then consisted of an engine and sixteen milk cars, and a rear coach for the accommodation of the crew; that after the train left Montpelier Junction the witness rode in the coach, and was still riding there at the time of the accident; during which time he was doing some writing in connection with the work of the train. It otherwise appeared that the distance from the station at Montpelier Junction to the Riverton station is about four and three-fourths miles. In cross-examination the witness testified as follows:

"Q. As conductor of this train did you have anything to do about seeing how the train is operated?

A. Yes, sir.

Q.   Did you take note of whether signals were given?

A.   Yes, sir.

Q.   And as to whether the whistle was blown or the bell bell rung?

A.   I don't have to take a note of that.

Q.   I mean you have to pay attention to see that that is done, don't you?

A.   I am supposed to.

Q.   That is your duty, is it not?

A.   It is the engineer's duty to blow the whistle.

Q.   Is it not your duty as conductor of that train to give your attention to the matter of whether the bell is rung or the whistle blown on your train?

A.   No.

Q.   What?

A.   No, sir.

Q.   You have no duty in that regard?

A.   Yes, I have, I have charge of the train.

Q.   What is your duty with regard to the blowing of the whistle and ringing of the bell—what is your duty as conductor of that train in regard to those things?

A.   I am supposed to see that all signals are observed.

Q.   On this occasion of this accident, as this train came south into and through Riverton station, I want you to tell this jury whether there was any whistle blown for that crossing or the bell rung, that you heard.

A.   Not that I heard.''

In redirect examination the witness testified:

''Q.   You said in your cross-examination that it was your duty to see that all signals were observed. Will you tell what you mean by that?

A.   To see that, as near as possible, the engineer blows the whistle and the bell is rung.

Q.   You were seventeen cars away from the place from which these signals would be given, were you not?

A.   Yes, sir.''

Again,

''Q.   What did you say you were doing when you first got notice of there being an accident?

A.   I was writing.

Q.   And for how long a period of time before you approached Riverton station had you been writing?

A.   I had been busy all the way from Montpelier Junction.

Q.  Busy at what?

A.  Writing.

Q.  Whether or not you had been listening for a whistle or a bell through there?

A.  No, sir.''

[5]    While at first glance the quoted testimony of this witness seems somewhat conflicting, it was positive in the following respects:    That, as conductor of the train in question, he had to do about seeing how it was operated; that he did ''take note of whether signals were given''; that he was supposed to pay attention to see that the whistle was blown or the bell rung; that his duty was such that he was supposed to see that all signals were observed; and that on the occasion of this accident, as the train came south into and through Riverton station, there was not any whistle blown for that crossing, nor bell rung, that he heard.    It is said by defendant in argument, however, that the witness testified in redirect examination that he had been busy writing in the rear car of the train all the way from Montpelier Junction to the place of the accident, and ''had not been listening for a whistle or a bell through there.''    Observing for the sake of accuracy, definitions given by Webster, to *take note* is ''to take notice of or observe.''    To *listen* is ''to give close attention with the purpose of hearing; to give ear; to hearken.''    Thus it is seen that the two answers of the witness to which reference is here particularly made, are not necessarily in conflict with each other.    Nor was the one given in cross-examination materially modified by the other.    The two were consistent with each other, and each could be given its full force as a statement of the truth if the jury deemed the witness worthy of belief.    The railroad crossing at the place of the accident was at grade, and in the operation of that train the giving of the required statutory signals was of primary importance for the safety of persons traveling on the highway toward the crossing and within such nearness thereto as to make warnings of an approaching train essential to their protection from danger.

In determining whether the testimony of this witness that there was no whistle blown or bell rung for the crossing in question, from his train on the occasion of the accident, that he heard, was more than merely negative in character, we take into consideration, not only the place where he was located on the train at the time, what he was doing by way of writing, and his oppor-

tunity for hearing such signals, though not listening for them, but also his duty as to seeing that all signals were observed, and his testimony that he did "take note of whether signals were given." See *Seviour's Admr.* v. *Rutland R. R. Co.*, 88 Vt. 107, 91 Atl. 1039. We have no doubt that the testimony of witness Muldoon that there was no whistle blown or bell rung, that he heard, was more than merely negative, and was proper for consideration.

This holding is decisive against defendant's exception to the failure of the court to instruct the jury that because conductor Muldoon was riding in the rear car of the train, was writing, and not listening, the fact that he did not hear the bell ring or the whistle blow must be disregarded in determining whether the statutory signals were in fact given.

William Donahue, a witness called by plaintiff, testified that at the time of the accident in question he was driving an automobile on the highway west of and going toward the crossing at Riverton station; that with him riding in his car was Mrs. Anna Maloy, both sitting on the front seat; that when on the hill above (west) of the Coburn building he first saw that train going south, and a little further on, when between the Coburn barn and house, eighteen or twenty rods from the crossing, he first had a plain view of the engine of the train; that the engine was then about midway between the Provost stone shed and the railroad trestle north; that the train continued southward and passed over the crossing; that without stopping his car continued down toward the crossing and passed over it after the train had gone by, his car being perhaps four or five rods back when the train cleared the crossing; that from the place where he first got a plain view of the engine down to four or five rods from the crossing, witness estimated the average speed of his car to have been about eight miles an hour; that from the time when witness first saw the train until it had cleared the crossing, his mind was on that train somewhat; that during any of that time there was no sound of a whistle blown or of a ringing bell coming from the engine, that he heard, and during that time he was within close hearing distance of such a bell if one had been rung, and his hearing was good; that as he came down the hill toward the crossing he saw Bardis's automobile on the east side of the crossing, headed westerly and in the vicinity of the side track, it being the same car that was in the wreck. Anna Maloy testi-

fied to being in the car with the last witness, riding on the front seat, at the time of the accident; that she saw the train coming from the north, saw it before she saw the automobile approaching from the opposite direction; that the car she was in went over the crossing without stopping; that she saw the train quite a ways back and it was coming pretty fast, went by very quickly; that she did not hear any whistle or bell at all; that the car she was in was an open one and top up, coming down the hill with brakes on and making no noise.

[6]    The testimony of these two witnesses tended to show that their attention was directed to the approaching train which they saw, and to the Bardis automobile which they saw at the same time on the other side of the main line and in the vicinity of the side track, during the time the train was running to and over the crossing from a point about midway between the Provost stone shed and the crossing, a distance (shown by defendant's plan drawn to scale) of some four hundred feet; that the automobile in which the witnesses were riding was within four or five rods of the crossing when the rear end of the train passed by; and that within such time they did not hear the sound of any whistle or bell coming from the engine of the train. So far as appears nothing else was taking their attention.    In such circumstances we do not think it can justly be said that their testimony that they did not hear any whistle or bell from the engine was without probative force.    Their position being as stated, they would be more likely than otherwise to hear such signals if given, and consequently their evidence in this respect was more than merely negative in character and was for the consideration of the jury on the question as to whether such signals were in fact given.    Based on circumstances essentially similar to those just stated in the case at bar, like rulings were made in *Walsh* v. *Boston & Maine R. R.*, 171 Mass. 52, 50 N. E. 453, and in *Henavie* v. *New York Central & H. R. R. R. Co.*, 166 N. Y. 280, 59 N. E. 901.    And the ruling in principle is like that made in our own cases of *Lincoln* v. *Hemenway,* and *Comstock* v. *Jacobs,* both cited above.

[7]    The holding made regarding the testimony of the last two witnesses is equally applicable to that given by defendant's witness Gino Comolli in cross-examination.    In direct examination this witness testified that at the time of the accident he had duties in connection with the railway station at Riverton, to see

that the switch lights were regularly lighted, cleaned, and kept in order; that he was working there the day of the accident, and was an eye witness of the accident itself; that he saw the train when it was coming around the cut north of the whistling post, which was before he saw the automobile; that when he first saw the automobile coming it seemed to be between the main track of the railroad and the side track; that he was then on the platform of the station, but went inside the station because he saw that the train and automobile were coming together, and when the latter was struck he was in the station, looking through the door that led into the office, and out through the bay window, by which he had a view of the railroad track to the north; that there was nothing that attracted his attention to the train before he saw it.  In cross-examination the witness said he had been attending to the lights just before the accident; that as the train came down there he could not say that he heard any whistle from it, and he didn't hear any bell from the locomotive; that when he first saw the automobile he should say the train was be- tween the sheds of Provost Brothers and Davis Brothers.  In re- direct examination, the witness said that when he saw that the train and automobile were coming together in collision he was somewhat excited; that he did not listen to hear whether any whistle or bell was sounded from the engine.  But (in recross- examination) he said that he was not in any way distracted by the possibility of an accident.  Notwithstanding the fact that the witness did not listen to hear whether such a whistle was blown or bell rung, his position was such at the time that, in the circumstances, it is reasonably probable that he would have heard either if such a signal had been given.  Nothing more was es- sential to make his testimony in that respect of sufficient pro- bative force to be for consideration.

[8]    Emmett Conrad, a witness called by defendant, testi- fied in chief that he lived at Riverton and had been acquainted with the railroad crossing there for nearly six years; that at the time of the accident he was approaching the crossing from the west, driving a pair of horses; that when almost to the Coburn house he heard one whistle from the train in question, "up north somewhere"; that when within a rod and a half or two rods of the main line he stopped his team and stood in front of his horses, they being afraid of the cars, until the train went by; that as he stood there he saw the Bardis automobile coming be-

tween the covered bridge and the Davis office; that when he first saw the automobile the train had passed the trestle. Being asked whether he remembered hearing the bell ring, the witness said he did not remember.

"Q. You would not say it did or didn't?

A. No, I wouldn't say either, because I don't remember." In cross-examination the witness testified,

"Q. That is to say, immediately after this accident you said, did you not, that you did not hear any bell on that locomotive?

A. I certainly did.

Q. And that is true now?

A. It is now."

The evidence of this witness in such respect was proper for consideration for the same reason as was that of the preceding witness, named.

[9] Several other of defendant's witnesses, when. testifying either in chief, or in strict cross-examination on matters touching which they had given testimony in chief, stated in substance that they did not hear any bell ring from the engine of the approaching train. Since the defendant was thus instrumental in this evidence being in the case, defendant is not in a position to object to its use because negative and not of probative force. It is therefore treated as proper for consideration by the jury, without further inquiry concerning it.

[10] Defendant excepted to the failure of the court to instruct the jury that in determining whether the statutory signals were given, they should disregard the testimony of any occupant of the automobile who testified that she did not hear the engine bell nor the engine whistle, but who did not say that she was listening, and in respect of whom there was no evidence as to how her sense of hearing was in fact engaged. It is enough to say of this exception that there was no such witness shown by the record. As before observed, there was evidence—and it was undisputed—that all the persons riding in the automobile were looking and listening for a train.

[11] There was the further exception to the failure to charge that in determining the question respecting such signals the jury "should disregard the testimony of any witness who testified that he did not hear the bell ring, or did not hear the whistle blown; but in respect of whom the evidence shows that at the time his sense of hearing and his mental faculties were

otherwise absorbed and engaged." Without mentioning other difficulties with his exception, we say only that it is too general to be availing.

[12] The evidence was sufficient to justify the finding returned as the first special verdict, and there was no error in the court's denial of the motion to set that verdict aside.

Since the failure of defendant to give the statutory signal stands established in the case, and since it is likewise established in connection therewith that such failure was the proximate cause or a part of the proximate cause of the accident, there is no occasion to consider the other part of said motion, namely, to set aside the fourth special verdict that the defendant failed to maintain its railroad at the crossing in a reasonable manner for the accommodation, safety, and convenience of public travel. The finding so returned is immaterial to the result reached on the record; for irrespective of such finding the judgment rendered must stand, unless reversible error be yet made to appear in connection with questions affecting the result.

Defendant's exceptions to the charge regarding the extent and precise duty of defendant in keeping the crossing in question in repair, and as to the meaning of "crossing" in that connection, are numbered 38 to 63, both inclusive. But we give these exceptions no consideration because of immateriality, the reason already stated for our like action respecting the motion to set aside the fourth special verdict.

The foregoing holdings are conclusive against the third paragraph of defendant's said motion, and it is not further noticed.

The result of our holdings on defendant's exceptions being one of affirmance, there is no occasion for considering the questions brought up for review by plaintiff.

*Judgment affirmed.*