## JOHNSON v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit.   November 10, 1920.)

No. 58.

Criminal law ⬅762(2)—Error to argue case against defendant in charge.

    While a federal judge is not a mere moderator, and may express his own opinion of the facts to the jury, if in doing so he puts the case argumentatively, he must put both sides; the defendant's as well as the government's theory.

    Hough, Circuit Judge, dissenting.

    In Error to the District Court of the United States for the Southern District of New York.

    Criminal prosecution by the United States against Walter Johnson. Judgment of conviction, and defendant brings error.   Reversed.

    Thomas Downs, of New York City, for plaintiff in error.

    Francis G. Caffey, U. S. Atty., of New York City (Charles W. Atwater, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

    Before WARD, HOUGH, and MANTON, Circuit Judges.

    WARD, Circuit Judge.   The defendant was indicted for knowingly, willfully, and feloniously receiving and having in his possession, with intent to convert to his own use, on May 27, 1918, six automobile outer tires, knowing that they had been stolen while part of an interstate shipment of freight, contrary to the form of the statute of the United States in such case made and provided.   37· Stat. c. 50 (Comp. St. §§ 8603, 8604).

    While we discover no merit in any error excepted to and assigned, we think there was a plain error, not excepted to nor assigned, which we may consider under our rule 11 (150 Fed. xxvii, 79 C. C. A. xxvii). It was an essential element of the offense that the defendant knew the tires in question had been stolen.   Whether his conduct was more consistent with innocence than with guilt was for the jury to determine. The defendant's theory of innocence is as follows:   That on May, 27, 1918, he was asked by a railroad brakeman named Schuyler to go with him in the defendant's automobile to get some goods down the road; that he did go that day in the daylight with Schuyler, who threw some tires out of bushes near the railroad track, which they brought to Schuyler's house in Maybrook, and he helped Schuyler put them in his cellar; that within a day or two Schuyler met him in his (the defendant's) automobile with his wife, and asked him where he was going; he replied, "To Newburgh;" Schuyler said, "Can I go with you to take the tires for the purpose of delivering them to the railroad detectives?" that he did go to Newburgh, and then Schuyler asked him to go to Poughkeepsie, which he refused to do, and Schuyler went to the fire house to leave the tires there, but the firemen would not take them; then he did consent to go to Poughkeepsie, where Schuyler

left him, to return, but, not reappearing for an hour, the defendant and his wife returned to Maybrook without Schuyler, and put the tires in the chicken house on his sister's place; that within a few days, having misgivings about Schuyler, he went to the chief of police at Newburgh, told him he had the tires, and wanted to turn them over to him; that the chief told him to keep them till he sent for them; that he had never disturbed the tags, wrappings, or serial marks of the tires; that he had never made any attempt to dispose of them.

We quite agree that a federal judge is not a mere moderator. He has a right to express his own opinion of the facts to the jury. If, however, in addition to doing so, he puts the case argumentatively, he must put both sides, the defendant's as well as the government's theory. Oppenheim v. United States, 241 Fed. 625, 154 C. C. A. 383. In this case the court intervened in the cross-examination of the defendant by the United States Attorney as follows:

"The Court: Where was it you went down the bushes and found these lying in the bushes? Alongside of the track?

"The Witness: Yes, sir.

"The Court: How did Schuyler tell you they got there?

"The Witness: He said he saw them there from the top of a box car.

"The Court: When did he say he had seen them?

"The Witness: He said he saw them that afternoon as he came in the yard.

"The Court: You accepted his statement on that?

"The Witness: Yes, sir.

"The Court: When you took these tires down to Newburgh, why did you understand Schuyler wanted to leave them at the fire house?

"The Witness: Because I didn't want to take them on into Poughkeepsie.

"The Court: What did you say to Schuyler about that?

"The Witness: I told him to leave them in Newburgh somewhere; if he wanted to take the tires further, to get somebody else; I didn't want to take them further, because I wanted to get to work.

"The Court: How far is it from Newburgh to Poughkeepsie?

"The Witness: About 15 miles.

"The Court: But you went on?

"The Witness: Yes; he kept coaxing me, and finally I said, 'All right; I will go there with you.'

"The Court: When you got to Poughkeepsie, Schuyler left you standing on the street?

"The Witness: Yes, sir.

"The Court: How long did you wait there?

"The Witness: I should judge an hour; maybe more; I didn't time myself.

"The Court: Where did you understand Schuyler had gone?

"The Witness: Schuyler said he was going down the street to see if he could find Pitney or some of the detectives.

"The Court: Did he tell you where that office was?

"The Witness: No; he didn't say.

"The Court: Did you look in the telephone book, or make any inquiry as to where the railroad detective's office was?

"The Witness: No.

"The Court: You just sat on the seat?

"The Witness: Yes, that is all; I sat in the car all the time.

"The Court: And then you came back to your home?

"The Witness: Yes.

"The Court: And placed these tires where?

"The Witness: In the garage or chicken coop.

"The Court: How far is this from your house?

"The Witness: Perhaps three or four blocks from where I lived at that time.

"The Court: Why didn't you take them down to your house?

"The Witness: I had no place to put them, unless I put them in the house.

"The Court: You made no effort to sell these tires?

"The Witness: No, sir.

"The Court: When did you begin to get a suspicion that these tires were stolen?

"The Witness: Well, a few days after I put them in the garage; I had not seen Schuyler any more, so I thought I had better advise somebody what to do about them, because I didn't want them to find the tires in my possession without notifying somebody; so with that I went to Newburgh and asked my lawyer what to do, and he advised me to go and tell Chief Brown, which I done.

"The Court: When was it that Schuyler told you he had talked to the call boy?

"The Witness: I think he told me that the day I went to Newburgh.

"The Court: That is, a week after you got the tires?

"The Witness: Oh, no.

"The Court: How long after you got the tires?

"The Witness: Why, I think it was the next day, or day after; it was shortly after I took the tires to his house, he asked me to take them to Newburgh for him.

"The Court: Did you ask him why it was necessary to cart these tires all over Rockland, Ulster, and Orange counties?

"The Witness: I did.

"The Court: What did he say?

"The Witness: He said he wanted to turn them into the detective's office at Poughkeepsie.

"The Court: There is a station at your place, isn't there?

"The Witness: Yes, sir.

"The Court: There is an agent there, isn't there?

"The Witness: Not in the station; no, sir.

"The Court: Isn't there a railroad agent there?

"The Witness: No, sir.

"The Court: No freight agent?

"The Witness: Way down the big office there is.

"The Court: How far is that from Maybrook?

"The Witness: Oh, a mile and a half.

"The Court: Did you suggest to Schuyler that that was the logical place to turn those in?

"The Witness: No; I didn't say anything to him at all.

"The Court: You made no inquiry as to why you should go on to Poughkeepsie, to Newburgh, to deliver those tires, when there was a railroad agent within a mile and a half?"

Though the foregoing indicated what the judge's opinion concededly was, namely, that the defendant had guilty knowledge, it would not be enough to hold the trial unfair because prejudicial to the defendant. But it was followed by a charge which, saying little or nothing about the defendant's theory of innocence, elaborated the government's theory of guilt:

"Finally the train goes into the yard. Some time thereafter, according to the testimony in the case, the brakeman, Schuyler, goes to this defendant and tells him that there are some automobile tires lying in the bushes alongside of the track whereon this long freight train of 80 cars had previously been standing, and with the automobile of the defendant they proceed to this point in the bushes, and there they pick up those tires. Then they take them to Schuyler's house and put them in the cellar of the house. In this operation they ignore, so far as the testimony is concerned, the railroad office, which is approximately a quarter of a mile, perhaps, from where they may pass in

their automobile. It is suggested that they did not want to drive over to the office, because it was difficult. But why, if Schuyler was acting with good purpose in the first instance, should he not have notified the railroad people in the yard at the office, even by walking, that the tires were lying in the bushes, and to send some one to get them, rather than that he should become their conservator or salver, and come into Maybrook, and go to this man, and get his automobile, and then go after the tires, and then, having got the tires, why should they be kept in his house a day or two, and then driven over to Newburgh and from Newburgh to Poughkeepsie, and an attempt made to leave them at the fire house on a Sunday, as I recall the testimony? Those are matters which go to the good faith of this transaction, the good faith of Schuyler and of the defendant. The defendant asks you to say that this is all consistent with innocence and an evidence of his good faith, and the government asks you to draw the inference that it is an inference of bad faith, and shows an intent and a purpose upon the part of both Schuyler and the defendant here to attempt to utilize these tires for their own purposes and for their own uses.

"It is quite true that Schuyler has been tried for stealing the tires, and the jury disagreed. You should eliminate that absolutely from your mind. The question is for you to determine upon this evidence what are the facts in this particular case; and if, for some reason, be that reason what it may, a jury in a previous case has reached a disagreement, it should have absolutely no bearing upon your determination and should be given no consideration by you.

"This case has to be passed upon from the evidence before you and your verdict is to be rendered according to your judgment as to what the facts justify.

"Now, I may say, with reference to the information which this defendant gave to the police department in Newburgh after he had consulted with his attorney, that that need not necessarily acquit him of bad faith and a dishonest purpose, if you find that, prior to his consultation with his attorney and his disclosure to the police department, he had an evil felonious intent. I mean to say that if I steal something, and have the purpose to apply what I steal to my own use, and thereafter I get frightened, or have a revulsion of conscience, or what not, and go and return, and say, 'Here is what I have stolen,' that does not wipe out my original crime. It may be something to appeal to the person who passes judgment upon the transaction, as to what judgment should be pronounced. If the original evil purpose was present, he is not excused, nor is the crime wiped out, by a revulsion of conscience or a desire to get in safety."

It appears plainly that the jury notwithstanding the court's attitude, entertained considerable doubt about the defendant's guilty knowledge:

"The Clerk: Mr. Foreman, have you agreed upon a verdict?

"The Foreman: We have.

"The Clerk: How say you, sir?

"The Foreman: Guilty, with a strong recommendation of clemency.

"The Clerk: Gentlemen of the jury, listen to your verdict as it shall be recorded; you say you find the defendant guilty, and recommend him to the mercy of the court.

"The Foreman: Yes.

"The Court: All right, gentlemen; I shall bear your recommendation in mind when sentencing this defendant. I think there is no doubt of his guilt; but I think the other man who was tried before him was also guilty, and I think it very regrettable that he was not convicted at that time, and I shall bear that in mind in sentencing him.

"Juror No. 9: The jury for some time could not agree. We finally agreed, and we make an appeal to you to be as merciful as possible to this man.

"The Court: Very well.

"Juror No. 9: We earnestly, every one of us, ask you to do so.

"The Court: I shall. The situation, gentlemen, as I view this thing, is this: I have no doubt as to this man's guilt; I do not think, however, that

I should sentence him nearly as severely as I could, in view of the fact the other man is out of jail, when he ought to be in jail. And the government, and all of us, know it is a very serious situation with respect to these peculations from railroad companies; they are simply astounding in the amount and character. I shall. however, give this man a very light sentence, in view of all the facts in the case. I will sentence him now."

The sentence of 30 days in the City Prison was a very lenient one, and the defendant was admitted to bail pending appeal in the sum of $2,500; but as we are of opinion that he is entitled to a new trial, the judgment is reversed.

MANTON, Circuit Judge (concurring). I concur with Judge WARD in reversing the conviction of the plaintiff in error, but wish to place the reversal upon an additional ground. It is incumbent upon the government to prove beyond a reasonable doubt that the plaintiff in error had guilty knowledge of the theft of the automobile tires. He was entitled to the protection of the elementary rule of the presumption of innocence and the necessity of proof of his guilt beyond a reasonable doubt. He cannot be convicted upon mere suspicion, nor should a jury be permitted to speculate as to guilty knowledge, in the absence of some evidence indicating such knowledge. The undisputed testimony in the case is consistent with his innocence. What he did in endeavoring to assist Schuyler does not indicate knowledge that the tires were stolen from the railroad company's possession.

I think error was committed in refusing to grant the motion for the direction of an acquittal.

HOUGH, Circuit Judge (dissenting). By one of the majority opinions this conviction is reversed, because the trial judge asked the accused pertinent and skillfully framed questions, and showed in his charge a lack of belief in that gentleman's veracity. I feel obliged still to dissent from that method of disciplining the judiciary, considering that it confounds the difference between legal error and what the reviewing authority does not personally like. Oppenheim v. United States, 241 Fed. at page 630, 154 C. C. A. 383.

Whether the accused had guilty knowledge was for the jury; the reasonable doubt of the criminal law being the jury's doubt, and not that of the court, and, in my opinion, especially not that of an appellate court, which has nothing before it but cold type.

The intimations of the other majority opinion would leave nothing to the jury but certainties; therefore from that also I dissent.