**UNITED STATES of America, Appellee,**

v.

**Joseph Omotunde FILANI,
Defendant–Appellant.**

**No. 73, Docket 95–1051.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 29, 1995.

Decided Jan. 11, 1996.

Colleen P. Cassidy, New York City (The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, New York, of counsel), for Appellant.

Jo–Anne Weissbart, Assistant United States Attorney, Brooklyn, New York (Zachary W. Carter, United States Attorney, Susan Corkery, Assistant United States Attorney, Eastern District of New York, Brooklyn, New York, of counsel), for Appellee.

Before: CARDAMONE, MINER, and CALABRESI, Circuit Judges.

CARDAMONE, Circuit Judge:

On November 30, 1993 Joseph O. Filani landed at John F. Kennedy International Airport in New York City, arriving on an Air France flight from Paris. He was returning home to Little Rock, Arkansas from a trip to Nigeria. Filani, a lawful permanent resident of the United States, is the father of four children, and at the time of these events he had been a U.S. resident for 14 years and owned a janitorial business in Little Rock. After landing, Filani went through a routine U.S. Customs Service inspection. What happened at the customs stop was the subject of conflicting evidence at trial.

A briefcase, understood by customs agents to be the defendant's, was opened and emptied of its contents. Believing the now emptied case too heavy, the investigating agent poked a sharpened screwdriver through its lining and found hidden bags containing white powder. When on-the-spot testing revealed the powder to be heroin, defendant was arrested. He was charged the following month in a two count indictment with importing heroin into the United States, in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and 960(b)(1)(A), and 18 U.S.C. §§ 3551 et seq., and possession of heroin with intent to dis-

tribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(i), and 18 U.S.C. §§ 3551 *et seq.* Filani was convicted on both counts after a two-day jury trial in the United States District Court for the Eastern District of New York (Tsoucalas, J.) and sentenced to serve ten years in prison.

## TRIAL PROCEEDINGS

At trial the prosecution called three witnesses: Inspector Wuehler, the customs agent who stopped defendant and arrested him; Detective Brosnan, who later questioned the defendant; and Special Agent Amentas, who testified as a heroin expert. The only witness for the defense was the defendant himself. He testified that he did not own the heroin-filled briefcase and never imported or possessed the contraband. Filani acknowledged having possession of the briefcase, and explained that he had assisted an elderly couple with their bags by carrying their attaché case on his baggage trolley. When he arrived at the customs checkpoint, defendant continued, he left the couple's bag on his trolley. He brought it to Agent Wuehler only because the customs agent specifically directed him to.

When the brief trial concluded, the jury had been presented with two divergent accounts of the events at J.F.K. Customs. In order for the government to prove its case, it had to show that the defendant's story was implausible in light of the other evidence or that Filani's version of those events lacked credibility. Thus, the outcome of the trial hinged on credibility. During its course the district court actively questioned the several witnesses presented, frequently interrupting their testimony and counsel's questioning. Some of its comments plainly were designed to prevent jury confusion or to clarify ambiguous testimony. Most of the court's questions, however, served only to discredit defendant. A number of these latter questions were asked directly of Filani; others were posed to government witnesses. Their effect was largely to bolster the government's case and to challenge the theory of the defense.

### A. Cross–Examination of Defendant

All the testimony was given in one day; defendant took the stand for half of that day. Since the defense called no other witnesses, Filani's own testimony was obviously the key to his defense. While defendant was being cross-examined by the prosecutor, the court repeatedly interrupted to make its own inquiry. For example, the court asked numerous questions concerning the location of the luggage trolley and defendant's use of it in the airport. Although our review is limited to the printed record, and we do not have the benefit of seeing the facial expressions of the questioner or the tone used, the trial judge's questions nonetheless betray a tone of incredulity. Some questions may perhaps even be described as argumentative:

Ms. Weissbart: Did you have your trolley at immigration?

The Defendant: I can't recall. I can't recollect where—

The Court: Well, you went to Nigeria three times that year. You went a couple of times in 1992. You went a couple of times in 1991?

The Defendant: Yes.

The Court: You know whether you had a trolley when you are going through Immigration?

The Defendant: Yes.

The Court: Did you have a trolley?

The Defendant: Yes, I do.

The Court: Did you have the trolley when you went through Immigration?

The Defendant: Yes, I do.

The Court: If I told you you can't take the trolley when you go through Immigration, would you believe me?

The Defendant: (No response.)

The Court: You only get the trolley when you go to the customs area, don't you?

The Defendant: It's the Customs area before you pick up your luggage, that's when you get the trolley.

The Court: Well, I told you to listen to the questions before you answer.

The trial judge also questioned the defendant extensively about his finances. The court first asked Filani how he could afford

to pay $200 in monthly child support, asserting that this would consume $12,000 of the defendant's $13,000 salary. After realizing its mathematical error, the trial court terminated this line of questioning and started a series of questions about Filani's two houses. It continually confused Filani's explanation of the amounts owed on each house, effectively detracting from defendant's credibility. Moreover, the district court peppered this exchange with comments and asides ("Is that what you are telling me?"; "All I asked you is, do you support the other children?"; "No, sir, listen to me.").

The district court also challenged the defendant's veracity with respect to his asserted transactions with the elderly couple whom defendant insisted he was attempting to help. On another occasion, it not only corrected a mistake defendant made but scolded him and forced him to admit his error before the jury:

The Court: You said you went there the latter part of October?

The Defendant: Yes.

The Court: How long did you stay?

The Defendant: Just about a week.

The Court: Two weeks?

The Defendant: A week.

The Court: Then you came back?

The Defendant: I came back, yes.

The Court: How come you came back November 30, if it was only a week, and you went in October?

The Defendant: I take that back. It was November ending.

The Court: Wait a minute. You said that you went to Nigeria. Did you make a mistake?

The Defendant: I do make a mistake.

The Court: Okay. I just want to make sure.

The Defendant: Yes, it was a mistake.

The Court: Go ahead.

### B. *Bolstering Government's Case*

The questioning cited above exemplifies the many instances where the district court conducted its own cross-examination of a witness. Other witnesses were asked questions with the obvious purpose of challenging the defendant's theory of the case. For instance, after defense counsel questioned Special Agent Amentas regarding whether drug lords ever "hide the narcotics with unsuspecting travelers," the agent replied, "I believe there are occasions when that happens." The district court then intervened with a series of follow-up questions that entirely demolished the helpful concession defense counsel had elicited from a prosecution witness:

The Court: Is it often?

The Witness: Based on my experience I would have to answer that no. But it has happened.

The Court: Would you say no because a drug lord wouldn't want to lose the drugs.

The Witness: Yes.

The Court: If you don't know the person you give it to it could be lost and you may never get it back?

The Witness: That's correct.

The Court: A lot of money is involved.

The Witness: Yes. They have a vest[ed] interest for one purpose. That is to make money. They are interested in seeing the narcotics delivered.

The trial transcript includes other similar examples of the district court injecting itself into the questioning of witnesses. On 16 of the 60 pages of the trial transcript where defendant's testimony appears, his credibility or the theory of his defense were challenged by inquiries from the presiding judge. During the presentation of the prosecution's case, the court intervened 13 times in 74 pages, but it never did so to the detriment of the government's position.

### DISCUSSION

#### I  Fair Trial Claim

Upon Filani's appeal from his conviction, the sole issue raised is whether the trial judge's persistent questioning of witnesses so interfered with the presentation of appellant's defense as to deprive him of a fair trial. Appellant asserts those questions were so skeptical that they amounted to a second cross-examination, suggesting to the jury that the trial judge agreed with the govern-

ment's version of what occurred at J.F.K. Customs. Despite a curative instruction and despite the failure by defense counsel to object, the district court's conduct, appellant believes, was plain error and sufficiently prejudicial to entitle him to a new trial.

### A. Trial Judge's Role in General

To place the complained-of actions in proper perspective, it is helpful to discuss briefly what is the province of a judge in a jury trial. In many civil law countries, the judicial officer has the primary responsibility for developing the evidence and questioning witnesses. The prosecutor and defense attorney are minor participants asking only an occasional question. *See* William T. Pizzi & Luca Marafioti, *The New Italian Code of Criminal Procedure: The Difficulties of Building an Adversarial Trial System On A Civil Law Foundation,* 17 Yale J. Int'l L. 1, 7–10 (1992). The American system is of course adversarial and therefore differs fundamentally from the inquisitorial, judge-centered civil system.

The trial judge's role in our jurisprudence came to us from the common law of England. Under English common law, the trial judge gave the jury directions not only in matters of law, but also, according to Sir Matthew Hale—a seventeenth century common law scholar and judge—gave "great Light and Assistance" by weighing the evidence and observed where the "Question and Knot of the Business l[ay]," even in matters of fact. Matthew Hale, *The History of the Common Law of England* 164–65 (Charles M. Gray ed., Univ. of Chicago Press 1971) (3d ed. 1739). Although the judge's direction was considered a great advantage to lay jurors, *id.*, such an official was not to be partial; for the trial judge to display partiality constituted reversible error. *Id.* at 163.

Propounding the same view as Hale, Wigmore tells us—citing English case law and scholarly writings—that the English trial judge is not a passive instrument of the parties, but has an independent duty to investigate the truth and, in so doing, may put questions in whatever form he pleases to the witness to elicit the truth more fully. *See* 3 Wigmore, Evidence § 784, at 188–89 (James

H. Chadbourn ed., rev. ed. 1970). As a consequence, English judges traditionally exercised much control over juries in matters of fact as well as law. *See* 9 *id.* § 2551, at 503–07.

This common law practice was one that, under the Constitution, descended to and has been more or less maintained by federal courts. *See Vicksburg and Meridian R.R. Co. v. Putnam,* 118 U.S. 545, 553, 7 S.Ct. 1, 2, 30 L.Ed. 257 (1886); *Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 698–99, 77 L.Ed. 1321 (1933). Today a trial court's broad power to interrogate witnesses is codified in Rule 614(b) of the Federal Rules of Evidence, which states: "Interrogation by court. The court may interrogate witnesses, whether called by itself or by a party." Thus, American judges, at least in theory, have some of the same powers in the conduct of a trial as their English counterparts.

Yet, in American courts the judge's right to ask questions of a witness, Wigmore tells us in scathing terms, has been preserved only in theory. In a number of modern cases on this subject he found "the abject surrender of the trial judge's function . . . repulsive in its misguided supineness." 3 Wigmore, § 784, at 190 n. 2. Most states, by judicial decision or constitutional or statutory provision, have cut back on the power a common law judge had to comment on the evidence. *See* Johnson, *Province of the Judge in Jury Trials,* 12 J.Am.Judicature Soc'y 76 (1928).

In our Circuit, Vermont and Connecticut state courts still follow the English rule that allows a trial judge to express his or her opinion regarding the evidence and its weight. *See Children's Store v. Cody Enters.,* 154 Vt. 634, 580 A.2d 1206, 1208–09 (1990) (holding that judge may comment on evidence so long as ultimate questions left for jury); *Seviour's Adm'r v. Rutland R.R.,* 88 Vt. 107, 91 A. 1039, 1040 (1914) (same); *State v. Tatum,* 219 Conn. 721, 595 A.2d 322, 331 (1991) (same); *State v. Cianflone,* 98 Conn. 454, 468–69, 120 A. 347 (1923) (same). New York, however, has limited the trial judge's role by statute. *See* N.Y.Crim.Proc.Law § 300.10(2) (McKinney 1993) (The trial court must "so far as practicable, explain the appli-

cation of the law to the facts, but it need not marshal or refer to the evidence to any greater extent than is necessary for such explanation"); *see also People v. Brown,* 129 A.D.2d 450, 451–52, 514 N.Y.S.2d 326 (1st Dept.1987) (in view of statutory enactment, a judge analyzing the evidence must "exercise scrupulous care that the review ... and accompanying comments are balanced and even-handed, and that they do not inappropriately influence the jury").

*Quercia* is illustrative of how federal courts have limited our inherited English practice. In that case, Chief Justice Hughes, writing for the Court and citing Hale's history, observed that the judge's prerogative to comment on the facts had "inherent limitations." *Quercia,* 289 U.S. at 469–70, 53 S.Ct. at 698–99. The Chief Justice said a trial judge may not assume the role of a witness, add to or distort the evidence, or comment in a one-sided manner or, by a hostile remark, diminish an accused's privilege to testify in his own behalf. *Id.* at 470, 53 S.Ct. at 699.

Moreover, experienced trial judges have championed the view that our adversarial system gives little room for trial judges' questioning of witnesses. One explained that a trial judge should remain aloof emotionally from the trial, keeping only a finger on its pulse to ensure its healthy progress. Bernard Botein, *Trial Judge* 125 (Simon & Schuster 1952). Another observed that sporadic intrusions into the flow of the trial by the presiding judge risk furnishing more confusion than guidance to the jury because the trial judge looks down at the case from the peak of a mountain of ignorance: "His intrusions will in too many cases result from partial or skewed insights. He may expose the secrets one side chooses to keep while never becoming aware of the other's. He runs a good chance of pursuing inspirations that better informed counsel have considered, explored, and abandoned after fuller study." Marvin E. Frankel, *The Search For Truth: An Umpireal View,* 123 U.Pa.L.Rev. 1031, 1042 (1975).

The rationale undergirding the notion that a trial judge should not become overly active in questioning witnesses is that it guards against bias on the court's part. *See* Stephen A. Saltzburg, *The Unnecessarily Expanding Role of the American Trial Judge,* 64 Va. L.Rev. 1, 16–21 (1978). As Justice Black said, to the extent that a judge takes responsibility for the facts, it reduces the function of the jury. *See Galloway v. United States,* 319 U.S. 372, 407, 63 S.Ct. 1077, 1095–96, 87 L.Ed. 1458 (1943) (Black, J., dissenting). Although a trial court may make all kinds of suggestions to counsel outside the jury's presence, its active interrogation of witnesses dilutes counsels' opportunity to have the jury see the full strength of the adversarial positions of the litigants. *See* Saltzburg, 64 Va. L.Rev. at 55.

One of the reasons for allowing an English judge greater latitude to interrogate witnesses is that a British trial, so it is said, is a search for the truth. In our jurisprudence a search for the truth is only one of the trial's goals; other important values—individual freedom being a good example—are served by an attorney insisting on preserving the accused's right to remain silent or by objecting to incriminating evidence seized in violation of an accused's Fourth Amendment rights. The successful assertion of these rights does not aid—and may actually impede—the search for truth. As Chief Justice Warren declared in *Miranda v. Arizona,* 384 U.S. 436, 480, 86 S.Ct. 1602, 1631, 16 L.Ed.2d 694 (1966), an attorney carries out a sworn duty to the best of his or her ability when advising a client to remain silent in the face of police questioning, and such advice is not a reason "for considering the attorney a menace to law enforcement." Or, as one of the dissenters expressed it, the lawyer fulfilling professional responsibilities "of necessity may become an obstacle to truthfinding." *Id.* at 514, 86 S.Ct. at 1649 (Harlan, J., dissenting). By preserving the role of lay jurors as the evaluators of witness credibility, American jurisprudence checks abusive governmental practices more reliably than when questions regarding credibility are left in the hands of professional judges.

### B. *Trial Judge's Role in This Circuit*

■ From our earliest days this Circuit has adopted a carefully balanced role for the trial judge. Our court has never embraced the so-called sporting theory of the common

law. This extreme theory viewed litigation as a game of skill and placed the trial judge in the position of an umpire, there simply to see that the rules of the game were obeyed. *See* 3 Wigmore, § 784, at 188–89. We have rejected such a limited role because a trial judge's duty to see the law correctly administered cannot be properly discharged if the judge remains inert. *See United States v. Marzano,* 149 F.2d 923, 925 (2d Cir.1945) (L. Hand, J.).

■ Instead, the trial court may actively participate and give its own impressions of the evidence or question witnesses, as an aid to the jury, so long as it does not step across the line and become an advocate for one side. Thus, we said nearly 80 years ago that a federal judge may express his or her opinion on the facts of a case so long as the judge makes it clear to the jury that they are the sole judge of those facts; but the judge should not become an advocate and argue the case for either side. *See Oppenheim v. United States,* 241 F. 625, 629 (1917). Because a federal trial judge is not a passive spectator or moderator, he or she retains the undoubted right to express his or her opinion of the facts to the jury; but, if the court argues the case, it must argue it for both sides—the defendant's as well as the government's. *See Johnson v. United States,* 270 F. 168, 169 (2d Cir.1920).

■ Our decisions further make clear that a trial court "should exercise self-restraint and preserve an atmosphere of impartiality and detachment," *Pariser v. City of New York,* 146 F.2d 431, 433 (2d Cir.1945) (A. Hand, J.), and such court exceeds its duty when it becomes an advocate and asks improper questions. *See Martucci v. Brooklyn Children's Aid Soc.,* 140 F.2d 732, 734 (2d Cir.1944). Where the court takes over the role of the prosecutor and displays bias, reversal is required. *See United States v. Guertler,* 147 F.2d 796, 797 (2d Cir.) (Frank, J.), *cert. denied,* 325 U.S. 879, 65 S.Ct. 1553, 89 L.Ed. 1995 (1945). The point should never be reached where it appears to the jury that the judge believes the accused is guilty; this impression, once conveyed, deprives defendant of the fair trial to which he is enti-

tled. *See United States v. Nazzaro,* 472 F.2d 302, 303 (2d Cir.1973).

### C. *Instant Case*

The record of this appeal demonstrates that the trial judge stepped well outside the balanced role appropriate to such a judicial officer and attests, we think, to the accuracy of Bacon's insightful comment that "an overspeaking judge is no well-tuned cymbal. It is no grace to a judge first to find that which he might have heard in due time from the bar; or to show quickness of conceit in cutting off evidence or counsel too short; or to prevent information by questions, though pertinent." Francis Bacon, Essays, *Of Judicature* 138, *in* 3 Harv.Classics (P.F. Collier & Son 1909).

■ Here the district court questioned Filani about the location and usage of the luggage trolley, it interrogated him critically about his finances and probed his story for inconsistencies; it forced defendant to admit an error before the jury. Of course, appellate review of the district court's conduct must be limited to what appears on the face of the written record, and we will not give much credit to the parties' assertions about a judge's tone of voice or gestures. *See, e.g., United States v. Robinson,* 635 F.2d 981, 984–85 n. 2 (2d Cir.1980), *cert. denied,* 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981). But we need not make any inferences concerning the district court's tone to recognize that these inquiries targeted the defendant's credibility and challenged his story more in the manner of a prosecutor than an impartial judge. Inevitably the court's elicitation of Filani's testimony led the jury to doubt his veracity. We have ruled that where "such doubt is injected by the court in a case where credibility of a defendant-witness is a key issue, there has been a deprivation of a fair jury trial." *United States v. Victoria,* 837 F.2d 50, 55 (2d Cir.1988).

■ Because it is the government's responsibility—not the district court's function—to prove all elements of its case beyond a reasonable doubt, the district court must maintain an appearance of impartiality and detachment. *See United States v. Maz-*

*zilli,* 848 F.2d 384, 388 (2d Cir.1988); *Pariser,* 146 F.2d at 433. Here such an appearance was not maintained. This failure was especially significant where so much hinged on the jury's assessment of the defendant's credibility. We have explained that "a jury's impression that the court disbelieves [defendant's] testimony surely affects its deliberations. The jury cannot be regarded as having freely come to its own conclusions about the defendant's credibility when the court has already indicated, directly or indirectly, that it disbelieves his testimony." *Mazzilli,* 848 F.2d at 388.

The trial court's inquiries demonstrated its disbelief of defendant's testimony. Its queries of Filani make plain that the court doubted that he ever spoke with an elderly couple or that the heroin-filled attaché case did not belong to him. Questions to Agent Amentas, interrupting the defense cross-examination, read almost as a "redirect" that served to rehabilitate that witness's testimony, and further demonstrate that the district court did not believe defendant's version of the events at J.F.K. Customs.

■ In reviewing the trial transcript we must take care not to focus on isolated episodes, but to assess the trial court's inquiries in light of the record as a whole. Repeated interference with the defense case may work to deprive defendant of a fair trial. *See United States v. Guglielmini,* 384 F.2d 602, 605 (2d Cir.1967) ("There are few pages of this defendant's testimony ... which are free of some question by the court, and there are numerous instances where the court took over the cross-examination from the prosecutor for extended periods."), *cert. denied,* 400 U.S. 820, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970). In the present case, of the roughly 60 pages of the trial transcript covering appellant's testimony, the trial judge substantively challenged the defendant on 16, or over 25 percent, of them. The judge also interfered repeatedly with the defense counsel's cross-examination of witnesses. Simply asking numerous questions is not error *per se;* rather, the overriding consideration is whether the judge saw to it that the jury had all the admissible evidence and knew it was free to find the facts as it thought the evidence showed them to be. *See United States v. Aaron,* 190 F.2d 144, 146 (2d Cir.), *cert. denied,* 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951).

■ As stated earlier, a trial judge's role is not that of umpire or referee as it is in the "litigation as a game" metaphor. *See United States v. DiTommaso,* 817 F.2d 201, 221 (2d Cir.1987). In its participation at trial a district court should ask those questions necessary for such purposes as "clarifying ambiguities, correcting misstatements, or obtaining information needed to make rulings." *United States v. Pisani,* 773 F.2d 397, 403 (2d Cir.1985). Where the questions are designed simply to clarify testimony, there is no reversible error. *See United States v. Switzer,* 252 F.2d 139, 144–45 (2d Cir.), *cert. denied,* 357 U.S. 922, 78 S.Ct. 1363, 2 L.Ed.2d 1366 (1958).

■ Again, it is difficult to determine from the cold black and white of a printed record how the trial judge's questioning of a witness affected the jury because each judge conducts a trial in his or her own individual manner. Although for that reason an appellate court must give the judicial officer presiding at the trial great leeway, still the presiding judge cannot interrogate so zealously as to give the jury an impression of partisanship or foster the notion that the judge believes one version of an event and not another. Curative instructions to the jury, to the effect that they can decide what version to believe as sole judges of credibility, do not remove such an impression once it is created. *See United States v. Grunberger,* 431 F.2d 1062, 1067–68 (2d Cir.1970).

■ It is of course extraordinarily hard to resolve claims alleging bias or partiality by a trial judge. *See Guglielmini,* 384 F.2d at 605. A searching examination of the entire trial transcript is required to assess their validity. Moreover, regardless of how a district court exercises its prerogatives, an appellate court too is charged with a duty—one that may not be abdicated—to ensure that the trial it is reviewing was conducted impartially. *See United States v. Warren,* 120 F.2d 211, 212 (2d Cir.1941) (L. Hand, J.).

■ Reading this record in its entirety, we think it unmistakable that the district court inappropriately intruded as an advocate during trial and thereby prejudiced defendant. If the defendant was to have any chance of winning acquittal, he had to convince the jury of his own credibility and the plausibility of his story. The district court's questioning struck at the very heart of those efforts, denying Filani the impartial verdict at the hands of the jury to which he was entitled.

## II Plain Error Under Rule 52(b)

Since defense counsel did not object to the trial court questioning of the witnesses, the only argument available to Filani on appeal is that such questioning constituted plain error as defined by Rule 52(b) of the Federal Rules of Criminal Procedure, which provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

■ Our authority to reverse errors not objected to at trial is "circumscribed." *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993). To show plain error an appellant must meet a high standard. First, there must be "error." If a legal rule has been violated without a valid waiver by the defendant, then there has been an error. Second, an error is "plain" if it is "clear" or "obvious." Third, the error must "affect substantial rights." *See id.* at 732–36, 113 S.Ct. at 1777–78. Application of Rule 52(b) is discretionary and it should only be invoked when the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936).

■ We think this high standard was met in the instant case. The error at trial was plain and obvious. Defendant has made a specific showing of prejudice by detailing numerous instances of the trial judge's intrusive questioning and explaining how that questioning influenced the jury's verdict. This kind of error has great impact on the fairness and public reputation of judicial proceedings. A trial court's impartiality is its highest responsibility, a compromise of which is a grave error indeed.

■ It is "clear error for a trial judge to ask questions bearing on the credibility of a defendant-witness prior to the completion of direct examination." *Victoria*, 837 F.2d at 55. This principle applies with equal force when the district court's questions are asked during the defendant-witness' cross-examination. When a judge joins in cross-examination, a "tag team" situation is created, where the prosecutor and judge take turns asking questions. The jury here was given a powerful impression that the district court agreed with the government that the defendant was guilty of the crime charged. It is the creation of such an impression of bias leading to defendant's conviction that is impermissible partiality and therefore plain error.

## CONCLUSION

We accordingly reverse defendant's judgment of conviction and remand this case for a new trial.