Anthony PACCIONE, Petitioner,

v.

People of the State of NEW YORK, Respondent.

Michael Paccione, Petitioner,

v.

J.D. Nash, Warden, FCI Schuylkill, Respondent.

Nos. 03 CV 4493 (NGKAM), 03 CV 4809 NGKRML.

United States District Court, E.D. New York.

Jan. 13, 2005.

362

For Anthony Paccione: Linda S. Sheffield, Esq. (Atlanta Ga.) For Michael Paccione: Castiglione, LLP, By Daniel J. Halloran, III, Esq. and Vito A. Palmieri, Esq. (Mineola, NY), for plaintiff.

Charles J. Hynes, Esq., Kings County District Attorney, By Jane S. Meyers, Esq. (Brooklyn NY), for defendant.

### OPINION AND ORDER

GERSHON, District Judge.

Petitioners Anthony and Michael Paccione each petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging their July 19, 2000 convictions, after a joint jury trial, in New York Supreme Court, Kings County (Chambers, J.), of one count of robbery in the first degree (N.Y. Penal Law § 160.15), one count of robbery in the second degree (N.Y. Penal Law § 160.10), one count of grand larceny in the second degree (N.Y. Penal Law § 155.40), one count of burglary in the second degree (N.Y. Penal Law § 140.25), and one count of tampering with physical evidence (N.Y. Penal Law

§ 215.40). Each was sentenced to concurrent prison terms of ten to twenty years, seven and one-half to fifteen years, two and one-quarter to four and one-half years, and one to three years, which were to run consecutively to federal sentences that they were then serving. On June 10, 2002, the Appellate Division, Second Department, unanimously affirmed petitioners' judgments of conviction. *People v. Anthony Paccione,* 295 A.D.2d 450, 743 N.Y.S.2d 561 (2d Dep't 2002), *lv. denied,* 98 N.Y.2d 731, 749 N.Y.S.2d 481, 779 N.E.2d 192 (2002); *People v. Michael Paccione,* 295 A.D.2d 451, 743 N.Y.S.2d 727 (2d Dep't 2002), *lv. denied,* 98 N.Y.2d 771, 752 N.Y.S.2d 11, 781 N.E.2d 923 (2002).

The State correctly notes that, as to each petitioner, some of the claims were not exhausted and are now procedurally barred. *See Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). However, for the sake of simplicity, each claim, whether exhausted by one brother or the other, will be addressed on the merits.

### PRE–TRIAL MOTIONS

#### A. Motion to Suppress Identification Testimony

Prior to trial, an identification hearing was held pursuant to *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Detective Anthony Cascella of the Brooklyn Robbery Squad, Police Officer Walter Jones, and Costco employees Michael Crosby and Angel Barrios testified at this hearing.

In April, 1997, neither Crosby nor Barrios was able to identify Anthony in a line-up. Crosby misidentified a line-up filler when viewing Michael's lineup, and Barrios could not identify anyone when he viewed Michael's line-up. Five days later, Crosby told Detective Cascella that he ac-tually recognized Michael in Michael's line-up, but was too afraid to identify him because he had received more than 20 anonymous hang-up calls. Nineteen days after the line-up, Barrios told police that he recognized Anthony, but was too frightened to identify him. He also testified that he received anonymous hang-up phone calls to his family's unlisted phone number.

At the hearing, Jones and Cascella stated that Barrios was told that there was a delay in the line-up because they were waiting for the attorneys for the defendants to arrive. Barrios confirmed at trial that the police had told them that they would have to wait because the suspects' lawyers were late and that he assumed that the perpetrators were in the line-up. At the conclusion of the hearing, counsel for Michael argued that, by advising the witnesses that counsel would be attending, the police effectively told them that there were suspects in the line-up. The court rejected the defense's argument. The court held that there was no police impropriety or suggestiveness in the line-ups used by the police. The court found that, although the witnesses had initially failed to identify Anthony and Michael, their subsequent identifications were not improper. The court also ruled that the witnesses could testify as to why they did not identify the defendants initially. Defense motions to sever were denied.

#### B. Motions to Suppress Physical Evidence

Prior to trial, the petitioners moved to suppress physical evidence recovered from their homes following their arrests based on a search warrant. The trial court granted the motions, but the Appellate Division modified the orders. With respect to Anthony Paccione. the Appellate Division ruled that a snub-nose revolver

and ammunition found on Anthony's property were properly seized and admissible at trial. *People v. Anthony Paccione*, 259 A.D.2d 563, 688 N.Y.S.2d 559 (2d Dep't 1999), *lv. denied*, 93 N.Y.2d 975, 695 N.Y.S.2d 61, 716 N.E.2d 1106 (1999). As for Michael Paccione, the Appellate Division ruled that an imitation pistol, ammunition, and tweed-brimmed cap that the police recovered from his home were properly seized and admissible at trial. *People v. Michael Paccione*, 259 A.D.2d 564, 684 N.Y.S.2d 902 (2d Dep't 1999), *lv. denied*, 93 N.Y.2d 975, 695 N.Y.S.2d 62, 716 N.E.2d 1107 (1999). Although not expressly identified in the Appellate Division's decision, it is now agreed by all parties that the Appellate Division left undisturbed the trial court's ruling suppressing the duct tape and walkie-talkie radio recovered from Michael's work shed.

Immediately prior to jury selection, the newly assigned trial judge asked the parties to identify the property that was the subject of the Appellate Division's modification of the suppression order. Although the Appellate Division order had sustained the suppression of the walkie-talkie radio and duct tape, there was some confusion in the record, and both Michael's counsel and the prosecutor ultimately indicated to the trial judge that the Appellate Division had ruled these items, along with the others, admissible. Michael's counsel requested an evidentiary hearing to determine whether the duct tape and walkie-talkie radio recovered from Michael's work shed could be admitted in evidence based on consent to search by Michael's wife. At the end of the hearing, the trial court ruled that Michael's wife had consented to the search and that the bag found in Michael's backyard, which contained the duct tape and walkie-talkie radio, could be admitted in evidence at trial.

## C. *Sandoval* Hearing

A hearing was also held pursuant to *People v. Sandoval*, 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974), to determine whether the prosecution could use defendants' criminal records against them if either of them chose to testify. The court held that the State would be precluded from any cross-examination alluding to "organized crime" or "mob connections," although it would be allowed to inquire as to Anthony's and Michael's fraud/arson convictions if Anthony and/or Michael chose to testify. The defendants did not testify.

### THE TRIAL

Taken in the light most favorable to the State, the evidence at trial established the following: On the evening of December 15, 1996, Mike Crosby, assistant general manager; Dean Pitter, administrative manager; Abel Stephenson, seasonal supervisor; and Angel Barrios, security guard, were working at a Costco retail warehouse located on 3rd Avenue between 37th and 39th Streets in Brooklyn, New York. Barrios controlled the receiving dock door with a button and intercom by his desk. A monitor showed the area outside the receiving dock.

At approximately 8:45 p.m., Crosby saw on the monitor that a man had approached the door of the receiving dock but did not seek entry. Crosby asked Barrios to investigate. Barrios, upon returning from his investigation, stated that the man, who was wearing a blue winter jacket, had walked away. Crosby went to his office shortly afterwards.

At approximately 9:15 p.m., another man, later identified by Barrios as Anthony Paccione, sought entry to the loading dock, telling Barrios via the intercom that he was an electrician. Barrios asked him what company he was with, but the man,

instead of answering, asked for "Angel." Barrios let Anthony in after hearing his own name. Anthony was wearing gloves, had a walkie-talkie radio, and carried two bottles of wine. Holding the bottles, he said, "Hey Angel, this is for you, this from my company," and then asked for "Mike." Barrios told Anthony that he could not accept gifts and asked him to sign in. Mike Crosby did not respond when Barrios attempted to reach him via walkie-talkie. At around this time, departing employees, as well as a call from his girlfriend, distracted Barrios. Two more men entered Costco, one of whom was the man in the blue jacket whom Barrios had seen earlier. As the two men walked past Barrios to the sales floor, Anthony said, "Those are my boys." Anthony stayed with Barrios for a few more minutes before going out to the sales floor as well. Barrios did not know anything was wrong until he heard the emergency exit alarm some time later. At trial, Barrios described the man with the bottles, whom he identified in court as Anthony Paccione, as 6 feet tall, in his late 40s, wearing dirty clothing, with rotted teeth and weighing about 280 pounds. He estimated that he spent a total of seven minutes with Anthony.

A man, whom Crosby later identified as Michael Paccione, tapped Crosby on the right side of his head with a gun and said, "this is a stickup, do as I tell you and no one will get hurt." Crosby saw a six-inch long black pistol with a magazine in the handle after he looked over his right shoulder. Crosby glanced at Michael and was instructed not to look at him. Crosby looked at him again and was told again not to look at him. Crosby described the man as a white male wearing a brown tweed jacket and work gloves. Another man, who was not identified, was wearing a blue jacket and holding a revolver pointed at Crosby.

Michael and the third man led Crosby to the vault. Pitter, who was inside counting money, opened the door. Pitter saw the corner of the face of one of the robbers and saw that the robber was wearing a tweed cap. The two men pushed Crosby into Pitter, who fell on the ground. The first gunman told Crosby to open the safe and to get on the ground. Crosby heard the men take plastic bags from a toolbox and fill them with money. Using duct tape, they bound Crosby's and Pitter's legs and tied their hands behind their backs with plastic ties. Anthony entered the vault. Although Pitter and Crosby did not see Anthony, they were aware there were at least three men because they heard them whispering, going through the safe, and putting money into trash bags. They heard the robbers tear a security camera off the wall.

Crosby told the robbers, after being questioned, that there was recording equipment in the break room. Two robbers left while one kept bagging money. When the two other men returned, Crosby was told to open the safe that was on a time lock. Crosby lied and said he could not open it. They took Crosby's keys and said they were coming back in five minutes.

Once the emergency exit alarm sounded, Pitter slipped out of his wrist ties, and Crosby pressed a panic button and dialed 911 with his nose. Stephenson, who had been held at gunpoint on the floor of the office, knocked on the vault door. Crosby opened it with his elbow, and Stephenson helped Crosby and Pitter get lose. The police arrived within minutes and discovered that the robbers had taken $168,000 in addition to a videocassette recorder and videotapes.

The prosecution put in evidence the imitation pistol, ammunition, tweed cap, duct

tape, and walkie-talkie radio that the police recovered from Michael's home and the snub nose revolver and ammunition that the police recovered from Anthony's home. Crosby testified that the hat seized from Michael's home looked like the one the first robber wore. He also identified the imitation gun as looking like the one he saw used during the robbery. Barrios could not identify the walkie-talkie radio, and Stephenson said that the walkie-talkie he saw during the robbery was thicker and not the same length as the one taken from Michael's home. Pitter said the gun seized from Anthony's home looked "very similar" to one of the robber's guns, but could not say it was the same one.

The defense presented several witnesses. Most notably, two of Anthony's children testified that on December 15, 1996, they and their father watched football on television and that their father was on his back barely able to move that day because of back pain. One testified that Anthony went to the chiropractor the next day and was treated for four or five weeks. Michael's wife also presented alibi evidence that she thought, although she was not certain, that she had spent the day with her husband. On rebuttal, the prosecution introduced official National Football League records indicating that the Jets game for that week was on December 14, 1996, not on the day of the robbery.

## STANDARD OF REVIEW

Title 28 U.S.C. §§ 2254(d)(1), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides that a petition for a writ of habeas corpus shall not be granted on a claim that was "adjudicated on the merits" in a state court proceeding unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §§ 2254(d)(1). Section 2254(e)(1) further provides that a determination of a factual issue made by a state court shall be presumed to be correct; the petitioner for habeas corpus relief bears the burden of rebutting that presumption of correctness by clear and convincing evidence.

■ In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the United States Supreme Court held that a state court decision is contrary to clearly established Supreme Court precedent if it "contradicts the governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Id.* at 405–06, 120 S.Ct. 1495. A state court decision involves an unreasonable application of Supreme Court precedent if, from an objective standpoint, the state court applied Supreme Court precedent unreasonably, that is, not simply incorrectly or erroneously. *Id.* The increment of incorrectness beyond error that is required, however, "need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000)).

## DISCUSSION

### A. Exclusion of Petitioners from Inquiry of Juror Number Seven

■ At trial, after Anthony's son testified regarding his father's whereabouts on the evening of the robbery, Juror Number Seven asked to speak with the judge. Neither defendant was present during the inquiry, although defense counsel had re-

quested that they be present. The juror said that, because he was also Italian, he was having "hostile" feelings towards Anthony and Michael and desired to "put them away." Tr. at 2123–24, 2136. When asked whether he had revealed these feelings to the panel, the juror said "A little bit. They heard me sounding off yesterday about some feelings I had after the testimony, but we didn't go into any detail." Tr. at 2126. He also told the court that, "[E]verybody in there is complaining about every little thing so it was seen as just another complaint." Tr. at 2127–28.

Defense counsel requested a mistrial, stating that Juror Number Seven could not be fair and that they could not determine whether he had "poisoned the jury." The judge called Juror Number Seven back for further questioning. The juror stated that "[E]verybody [was] venting their feelings about the last witness." Tr. at 2153–54. The court held an inquiry of the other jurors and alternates. Juror Number One said that, although he heard some comments in the jury room, what he heard would not interfere with his judgment. Alternate Number Two said that she heard Juror Number Seven say he did not "feel right about it," but said that she did not know why he felt that way and that his comment would not affect her. The remainder of the jurors and alternates said they had not heard any comments that would affect their ability to be fair. Defense counsel renewed their application for a mistrial. The court discharged Juror Number Seven and substituted an alternate when the trial continued, but denied the request for a mistrial.

 Petitioners claim that their Sixth Amendment right "to be present at all stages of the trial where their absence might frustrate the fairness of the proceedings" was violated when the trial court excluded them from the inquiry into the ability of Juror Number Seven, to deliberate on the case fairly, citing *Faretta v. California,* 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Although a state criminal defendant has a federal constitutional right to be present at all stages of his trial, the right is "triggered only when the defendant's 'presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charges.'" *Cohen v. Senkowski,* 290 F.3d 485, 489 (2d Cir.2002) (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105–06, 54 S.Ct. 330, 78 L.Ed. 674 (1934)). Where the criminal defendant's absence during a conference between the judge and a juror does not impede the fundamental fairness of the trial or defendant's ability to defend himself against the charges, his right to personally attend that conference is not constitutionally required. *U.S. v. Gagnon,* 470 U.S. 522, 526–27, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985); *see also United States v. Jones,* 381 F.3d 114, 122 (2d Cir.2004).

Here, as the Appellate Division correctly stated, the exclusion of petitioners from the inquiry of Juror Number Seven did not diminish their ability to defend themselves. Indeed, they received the relief they sought when the trial court discharged the biased juror, who had stated that he was uncomfortable speaking in the presence of the defendants and would not have disclosed his concerns about his ability to be impartial if he had thought they would be present. Tr. at 2103. Because petitioners have failed to show that the Appellate Division's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent as set forth in *Gagnon,* petitioners are not entitled to relief on their claims based on their exclusion from the questioning of Juror Number Seven.

### B. Failure to Grant Mistrial Based on Alleged Premature Deliberations

■ Petitioners make a related claim that the jurors engaged in "premature deliberations" and that the trial court violated their constitutional rights when it denied the motion for mistrial that was brought on this basis. The Appellate Division concluded that "juror number seven's remark did not establish that the members of the jury engaged in premature deliberations." *Anthony Paccione,* 295 A.D.2d at 450, 743 N.Y.S.2d 561; *see also Michael Paccione,* 295 A.D.2d at 451, 743 N.Y.S.2d 727 (dismissing Michael's similar claim as "without merit."). The Appellate Division's decision was fully supported by the record and not contrary to, or an unreasonable application of, federal law.

### C. Trial Court's Antagonism Towards Defense Counsel

■ Petitioners claim that they were deprived of a fair trial because the trial judge showed contempt for the defense, in particular counsel for Anthony Paccione, at the sidebar and in open court, engaged in attacks on the defense, and that the court and court officers made faces that "polluted" the jury.

■ To prevail on a claim of judicial misconduct, the petitioners must show that the state trial judge's conduct was so fundamentally unfair as to deprive them of their constitutional right to due process. *Gayle v. Scully,* 779 F.2d 802, 806 (2d Cir.1985). "A petitioner claiming that a judge's bias deprived him of a fair trial faces a difficult task," and "a federal court will not lightly intervene when such a claim is asserted." *Id.* As the Supreme Court has stated, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

Petitioners attempt to support their claim that the trial judge expressed criticism of defense counsel in the presence of the jury principally by reference to the self-serving and unsupported comments of Anthony's trial counsel that were made near the close of a month long trial in support of a motion for mistrial. *See* Tr. at 2241–47. The prosecutor contested the factual bases for the claim, as did the trial judge. Michael's counsel, who "reluctantly" joined in the application for a mistrial, acknowledged that, while he contested various of the judge's rulings, he had never been denied the opportunity of making an appropriate record. Tr. at 2248–49.

Insofar as the trial judge, in the course of a lengthy trial, may have on occasion expressed her exasperation with counsel in front of the jury, it is noteworthy that current counsel for Anthony acknowledges that some challenged comments by the judge may have been provoked by counsel's continuing to do things that the court had specifically cautioned him not to do.[1] *See* Anthony Paccione's Mem. in Support of Pet. at 35.

Moreover, there is no claim that any criticism that the judge made in front of the jury about defense counsel's conduct extended to the defendants themselves.

---

1. Anthony Paccione's Memorandum also states: "The court expressed dissatisfaction with defense counsel's conduct only after defense counsel had intentionally failed to abide by discovery rules (Tr.2028, 2659–61); had apparently threatened to disobey a ruling of the court (Tr. at 2194, 2247); had attempted to make physical contact with the court (Tr. at 2245–47) and had been rude to the court (Tr. 2244–47)." Anthony Paccione's Mem. in Support of Pet. at 33.

*Cf. United States v. Filani,* 74 F.3d 378 (2d Cir.1996) (reversing conviction where trial judge's questioning of the defendant conveyed his disbelief of defendant's testimony). The trial judge, in her final charge, instructed the jury as follows:

> I have made various rulings on objections made by either counsel, and on other areas of law. You must not infer from any of my rulings, or anything I may have said during the trial that I hold any personal views for or against these defendants.
>
> Further, you must not draw any inference or conclusion from any question that I did not allow to be answered or from any testimony stricken from the record, nor any of these instructions, nor by any relations or remarks that I have made that I mean to indicate any opinion as to the facts or as to what your verdict should be.

Tr. at 2607–08. In sum, the petitioners were not denied a fair trial by the trial judge's conduct and, under AEDPA, there is no reason to upset the Appellate Division's rejection of this claim.

### D. Preclusion of Testimony by Anthony's Chiropractor

■ Anthony contends that the trial court violated his right to compulsory process when it precluded the testimony of his chiropractor, who would have stated that Anthony was suffering from a back injury when the crime occurred and thus would have corroborated the alibi testimony of Anthony's children.

In *United States v. Scheffer,* 523 U.S. 303, 308–09, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998), the Supreme Court observed that "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," and that "[s]uch rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" (quoting *Rock v. Arkansas,* 483 U.S. 44, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)); *see also Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (upholding an order excluding testimony of defense witness as sanction for noncompliance with discovery rules and misleading the court regarding the witness's whereabouts).

The trial court, in rejecting Anthony's request to introduce the chiropractor's testimony, found that defense counsel had committed an intentional discovery violation. The judge stated that the defense had not complied with the prosecutor's request for reciprocal discovery for a period of three years. Although Anthony and his trial counsel knew of Anthony's back problem, defense counsel had not disclosed the name of the witness he wished to call until at least a week into the trial. Defense counsel also spelled the witness's name incorrectly and subsequently refused to state anything else about the witness and why he might be called. Furthermore, when defense counsel did provide the medical records to the prosecutor, they were nearly illegible and did not contain the name of the chiropractor or any other doctor. The trial court also noted numerous dangers with prolonging the already long trial. The court, considering the discovery violations, the possible ramifications of a delay, and that Anthony's own children had testified about his back problems, decided to preclude the witness.

Anthony has failed to demonstrate that the Appellate Division's decision that this claim was without merit was contrary to or involved an unreasonable application of clearly established federal law as set forth in *Scheffer* and *Taylor.* Accordingly, the claim regarding the exclusion of the chiropractor is rejected.

### E. Preclusion of Testimony by Expert on Eyewitness Identification

■ During the People's case, the defense told the court that it would seek to present expert testimony on eyewitness identifications. During the defense case, counsel for Anthony and Michael asked the trial court to permit a psychologist who was an expert on eyewitness identification to testify about "the scientific framework for an eyewitness identification." After reviewing material submitted in support of the application, the court denied the application because the "analysis you would like the jury to make is within the ken of the jury. It does not require any specific expertise." Tr. at 2180.

Petitioners argue that the trial court's action violated their Sixth Amendment right to present a defense. They assert that an expert was necessary because there were identification discrepancies. The Appellate Division, which rejected this contention as meritless, explicitly stated on Michael's direct appeal that the trial court granted a request for an adjournment to allow the defense to prepare an offer of proof but the defense failed to make a persuasive showing that this case was one in which the jurors would have "benefited [from] the specialized knowledge of an expert witness." *Michael Paccione,* 295 A.D.2d at 451, 743 N.Y.S.2d 727.

Petitioners have failed to show that the Appellate Division's decision to affirm the trial court's preclusion of the eyewitness identification expert was either contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Under established law, the need for an expert, based upon the defense proffer, was within the trial court's discretion. Petitioners point to no Supreme Court precedent to the contrary.

### F. Prosecutorial Use of Suppressed Evidence

■ Petitioners claim that due process was violated when the trial court allowed the prosecutor to use evidence, specifically the duct tape and walkie-talkie radio, which had been suppressed by the state courts on Fourth Amendment grounds. Although a Fourth Amendment claim is ordinarily not reviewable here, *see Stone v. Powell,* 428 U.S. 465, 494, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992), the court will assume that a prosecutor's use of suppressed evidence violates due process and, therefore, will review this claim, not as a Fourth Amendment claim, but as a due process claim.

To begin with, there is no evidence that the prosecutor engaged in willful misconduct. On the contrary, it appears from the record that all parties were confused. As noted above, the Appellate Division's decision modifying the suppression ruling did not expressly reference these two items. The trial judge is not the same judge who had made the suppression rulings counsel to advise her as to what items remained suppressed under the Appellate Division's order, and counsel did not advise her accurately.

In any event, while the suppressed evidence should not have been introduced, it was not sufficient to provide a basis for conviction or to eliminate reasonable doubt. *See Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.1998). Habeas corpus relief is unwarranted because petitioners were not denied a fundamentally fair trial as a result of the admission. As all parties recognize, the duct tape was a common household item, and no witness could positively identify the walkie-talkie radio as the one used by the robbers. The introduction of the suppressed evidence, raised by Michael on direct appeal, was rejected

on the merits by the Appellate Division. It cannot be said that the Appellate Division's decision was contrary to, or an unreasonable application of, federal law.

 Furthermore, this error was harmless. Under AEDPA, the standard for reviewing a state court's determination of harmless error is whether the determination was contrary to, or involved an unreasonable application of, the standard set forth in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)whether the error was harmless beyond a reasonable doubt which governs direct review of criminal convictions for constitutional error. *See Mitchell v. Esparza,* 540 U.S. 12, 17–18, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) (*per curiam*); *Gutierrez v. McGinnis,* 389 F.3d 300, 306 (2d Cir.2004); *Zappulla v. People of New York,* 391 F.3d 462, 467 (2d Cir.2004). But where, as here, the state appellate court has not expressly engaged in harmless error review, the Second Circuit has treated as an open question whether a federal court conducting habeas corpus review should employ the *Chapman* standard, or instead use the standard set forth in *Brecht v. Abrahamson,* 507 U.S. 619, 630, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), for collateral review, i.e. whether the error has substantial and injurious effect or influence in determining the jury's verdict. *See Gutierrez,* 389 F.3d at 306. In this case, however, the result is the same under either standard. Although the prosecutor referred briefly in summation to the duct tape and walkie talkie radio, his chief emphasis, with respect to physical evidence seized from the petitioners' homes, was on the imitation gun and snub nose revolver. And, of course, the principal evidence was from the victims themselves, one of whom identified Michael and one of whom identified Anthony as the robbers. In light of the overwhelming evidence against peti-

tioners, the court is satisfied that the admission of the duct tape and walkie-talkie radio did not have substantial and injurious effect or influence in determining the jury's verdict, and was, in fact, harmless beyond a reasonable doubt.

### G. Prejudicial References to Petitioners' Ethnicity

 Petitioners claim that they were denied a fair trial by the admission into evidence of testimony that the victims, when asked by the police for identifying information about the robbers, described them as Italians from Brooklyn, in particular Bensonhurst. (Anthony's counsel had essentially opened the door to this evidence by asking whether the victims had described the ethnicity of the robbers.) Noting that the trial judge had barred any evidence suggesting that the crime was related to organized crime, petitioners argue that the prosecution was seeking to raise the organized crime issue indirectly. There is simply no support for this claim in the record. As just noted, the defense opened the door to the testimony by asking whether the victims had described the ethnicity of the robbers. In any event, the prosecutor made no organized crime insinuations and made no effort in his summation to suggest that the ethnicity of the defendants tied them to organized crime. AEDPA deference fully supports the Appellate Division's conclusion that this claim is without merit.

### H. Anthony's Claim of Ineffective Assistance of Trial Counsel

 Anthony Paccione contends that his counsel was constitutionally ineffective. He argues that trial counsel improperly failed to: (1) become familiar with the facts of the case and the applicable law, which led to his failure to obtain sufficient information to succeed in having the court

admit the testimony of the chiropractor and eyewitness identification expert; (2) object when evidence which had been suppressed was introduced by the prosecution; (3) inquire as to juror misconduct when it became clear that jurors, other than Juror Number Sevenl, had been discussing the case and his alibi witness; (4) abide by discovery rules; (5) maintain a non-hostile environment in the courtroom by engaging in repeated bickering with the trial judge; (6) object to bolstering of Barrios' testimony; (7) obtain the NFL schedule so Anthony's children would not look like they were falsifying testimony.

To succeed on an ineffective assistance of counsel claim, a defendant must show both that counsel's performance fell below the objective standards of reasonableness dictated by prevailing professional norms and that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–94, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under the first prong, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). To establish the second, "prejudice" prong, a defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. 2052. A "reasonable probability" in this context is one that undermines confidence in the outcome of the proceeding. *Id.*

On direct appeal, Anthony did not raise all of the claims of ineffectiveness of trial counsel that he seeks to raise now. Since he did not raise the claims relating to the eyewitness identification expert or the NFL schedule, they are now procedurally barred. *See Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. In any event, those claims are without merit. As to the eyewitness identification expert, petitioner fails to identify what additional investigation or evidence from counsel might have led the trial court to a different decision, or even how the admission of the expert's testimony would likely have led to a different result at trial. As to the second unexhausted issue, Anthony faults his trial counsel for failing to investigate the NFL schedule "so the children would not look like they were falsifying testimony." In effect, petitioner suggests that it was his attorney's function to be sure that petitioner did not offer an alibi defense through his children that the prosecution would be able to demonstrate was perjurious. He cites no authority for this proposition.

The remaining ineffectiveness of trial counsel claims were presented to the Appellate Division and denied as without merit. As discussed below, petitioner cannot show that the Appellate Division's decision was either contrary to, or an unreasonable application of, clearly established Supreme Court law relating to standards for effective representation by trial counsel.

Petitioner argues that counsel's assistance with respect to the introduction of the chiropractor's testimony was ineffective because counsel did not know how to spell the witness's name, did not turn over the chiropractor's reports to the prosecution and was found to have intentionally failed to follow discovery rules of the court. Petitioner contends that, had the testimony been admitted, the result of the trial

would likely have been different. However, as the trial court noted, the facts regarding Anthony's bad back had already come into evidence through Anthony's children. While counsel did err in serving notice of the witness late, trial counsel never represented that the chiropractor would have testified that Anthony had been physically incapable of committing the robbery, but only that Anthony was "in great pain" and had "limited mobility" on the date of the crime. Tr. at 2182. He acknowledged that the chiropractor's testimony would not be a "knockout punch." Tr. at 2020. At most, as counsel conceded, the witness would have corroborated the testimony of Angelo and Vanessa Paccione that Anthony was suffering from back pain on the day of the robbery and was treated by a chiropractor beginning on the day after the robbery. There is no reason to believe that the trial would have had a different result had the chiropractor been allowed to testify.

■ Petitioner argues that counsel's failure to contest bolstering testimony by Cascella about Barrios' eyewitness account amounts to inadequate representation. To begin with, "it is settled law that '[t]he concept of "bolstering" has no place as an issue in criminal jurisprudence based on the United States Constitution.'" *Best v. Superintendent of Clinton Correctional Facility*, 1990 WL 164673 (E.D.N.Y.1990) (quoting *Snow v. Reid*, 619 F.Supp. 579, 582 (S.D.N.Y.1985)); *see also Walker v. Scully*, 1992 WL 220002 (E.D.N.Y.1992) (noting that the courts of the Second Circuit have never regarded the practice of bolstering as inimical to trial fairness). While failure to assert a right under state law could give rise to an ineffectiveness claim, here, it was defense counsel who raised the issue of ethnicity and opened the door to the challenged testimony. Indeed, defense counsel stated that he wanted to use descriptions that eyewitnesses provided to undermine the reliability of the in-court identifications. This appears to be a strategy that was thought out by defense counsel, and strategic choices made by counsel after a thorough investigation of facts and law, as appears to be the case here, are "virtually unchallengeable." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. Therefore, there is no merit to this aspect of the ineffectiveness claim.

■ Petitioner contends that trial counsel permitted suppressed physical items to be admitted into evidence because he had not adequately familiarized himself with the case. Anthony had no standing to challenge the admission of the duct tape and walkie-talkie radio, which were not found on his property, but his brother's. In any event, these were common items, and were not linked with the robbery by any witness. *See* discussion *supra* at pages 370–71.

■ Petitioner further claims that counsel was ineffective because he failed to inquire into the possibility of juror misconduct when it became clear that jurors other than Juror Number Seven were discussing the case and the testimony of Anthony's son, an alibi witness. This claim is also without merit. As the Appellate Division found, Juror Number Seven's remarks did not establish that the jurors engaged in any premature deliberations. The trial judge properly questioned the jurors, dismissed Juror Number Seven, and arrived at the conclusion that all remaining members could be fair and impartial in deciding the case. There was no need for trial counsel to further investigate the possibility of premature deliberations.

■ Petitioner also argues that trial counsel's representation was constitutionally inadequate because of his conduct at trial. In this claim, in contrast to his

attack on the trial judge, he argues that trial counsel's "bickering" with the trial court created a hostile environment in the court, which caused prejudice against the defense. *See* discussion *supra* at pages 368–69. But petitioner fails to show that there is a reasonable probability that, but for counsel's behavior, the result of the trial would have been different.

In sum, petitioner fails to demonstrate that, but for counsel's performance, the outcome of the trial would have been different. Thus, petitioner has failed to show that the Appellate Division's decision that this claim was meritless was either contrary to or an unreasonable application of clearly established Supreme Court precedent governing ineffective assistance of counsel claims.

### G. Anthony's Claim of Ineffective Assistance of Appellate Counsel

Anthony Paccione also contends that he received ineffective assistance of counsel during the state appellate process because (1) appellate counsel failed to raise the suppression issue again in order to preserve the issue for review at the federal level and (2) appellate counsel should have raised the issue that trial counsel should have obtained the NFL schedule so Anthony's children would not look like they were falsifying their testimony.

▮ Although Anthony never exhausted his claim that his appellate counsel was ineffective by filing a petition for a writ of error *coram nobis* in the Appellate Division, the federal statute governing habeas corpus gives the district court the discretion to deny a habeas corpus petition on the merits "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2). Because, as is explained below, it is clear that Anthony's claim concerning his appellate counsel lacks merit, the claim will be denied.

▮ To establish a claim of ineffective assistance of appellate counsel, Anthony must satisfy the same two-pronged test outlined in *Strickland*. Defense counsel prosecuting an appeal from a criminal conviction does not have a constitutional duty to raise every nonfrivolous issue requested by the defendant. *Jones v. Barnes*, 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Appellate counsel may focus on key issues and "winnow out weaker arguments," *id.* at 751, 103 S.Ct. 3308, so long as counsel is careful not to overlook "significant and obvious issues while pursuing issues that were clearly and significantly weaker," *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994).

▮ Anthony's claims regarding appellate counsel are that counsel failed to raise the suppressed evidence issue and failed to raise a claim that trial counsel was ineffective for not obtaining the NFL schedule. For the reasons discussed above, these failures had little likelihood of affecting the success of the appeal. Appellate counsel raised seven claims in the lengthy brief submitted to the Appellate Division. Under the ineffective assistance of trial counsel claim, appellate counsel raised five distinct claims. That appellate counsel chose to winnow out the relatively weak issues in favor of other stronger ones does not render his representation ineffective. Anthony's claim that he was deprived of effective appellate counsel is rejected.

### CONCLUSION

Both petitions for a writ of habeas corpus are denied. As petitioners have failed to make a substantial showing of the denial of a constitutional right, each is denied a certificate of appealability.

**SO ORDERED.**